**LYKES–YOUNGSTOWN COR-PORATION**

v.

**The UNITED STATES.**

**No. 399–67.**

United States Court of Claims.

Jan. 23, 1970.

J. Alton Boyer, Washington, D. C., for plaintiff, Odell Kominers, Washington, D. C., attorney of record, J. Alton Boyer, Michael Joseph, and Kominers, Fort, Schlefer, Farmer & Boyer, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

This is a suit by a steamship company against the United States for damages for an alleged breach of three construction-differential subsidy contracts involving the construction of twelve ships. (Four ships in each of the contracts.) [1]

The plaintiff is now, and, at all times relevant to this case, has been engaged in the business of operating ocean-going cargo ships on regular routes found by the Maritime Subsidy Board to be essential trade routes of the United States between ports in this country and ports in foreign countries throughout the world.[2]

These operations are conducted under an operating-differential subsidy contract (No. FMB–59) entered into pursuant to Title VI of the Merchant Marine Act of 1936, 49 Stat. 1985, as amended (46 U.S.C. §§ 1171–1183) by plaintiff

---

1. This action was originally brought by Lykes Bros. Steamship Co., Inc., the corporation that was involved in all of the matters referred to herein. In May 1968, the name of that corporation was changed to Lykes Corporation and its entire shipping business, including the contracts herein suit and the vessels constructed thereunder, was transferred to a newly-organized subsidiary, also named Lykes Bros. Steamship Co., Inc. By order of July 9, 1968, the designation of the original plaintiff herein was changed to Lykes Corporation and the new subsidiary was added as a party plaintiff. On May 28, 1969, Lykes Corporation was merged into and is now known as Lykes-Youngstown Corporation. For convenience, all of these corporations will be referred to herein as plaintiff.

2. In all matters relevant to the present case, the United States, defendant, acted through the Federal Maritime Board, Maritime Administration, Maritime Subsidy Board, and the Secretary of Commerce. For convenience, all of these agencies will be referred to herein as the Board.

and the United States in 1957 for a term of twenty years beginning January 1, 1958. Under this contract, plaintiff is required to perform specified numbers of voyages annually on essential trade routes and to replace its existing ships by contracting to build new ones. The replacement program in the contract required plaintiff to build three groups of four ships each, construction of which was to commence on or about March 18, 1963, July 1, 1963, and July 1, 1964, respectively. Plaintiff's obligation to have these ships constructed was conditioned upon the board's policy to provide construction-differential subsidy pursuant to Title V of the Act for such new construction, and, if not provided, was to be deferred until such subsidy was provided.

The purpose of the construction-differential subsidy, which is a shipyard subsidy, is to equalize the cost of building ships in high-cost domestic United States shipyards with the lower cost of building such ships in foreign shipyards, from the standpoint of the owner, which is required by law and contract to have its ships built in the United States. The plaintiff filed applications for construction-differential subsidy covering each of the three groups of ships and the Board approved such applications and agreed to provide construction-differential subsidy in accordance with contracts entered into between the plaintiff and the defendant as described in the following paragraphs.

On April 4, 1963, November 21, 1963, and June 26, 1964, the plaintiff, as owner, and the Board entered into three construction-differential subsidy contracts Nos. MA/MSB–20, MA/MSB–31, and MA/MSB–37, each covering a group of four ships and each specifying the terms of the grant of subsidy by the Board in connection with the construction of said ships. At the same time, three construction contracts, Nos. MA/MSB–19, MA/MSB–30, and MA/MSB–36, were entered into between the plaintiff, as owner, and Avondale Shipyards, Inc., as contractor, and the Board, which provided for the construction of the twelve ships by the contractor. These construction contracts are only incidentally involved in this case. Each of the construction contracts contained the same provisions as those set forth below from contract No. MA/MSB–19, differing only in the amount of subsidy per vessel and the percentage for changes determined by the Board to be eligible for subsidy:

\* \* \* \* \* \*

ARTICLE IV. *Payment of Contract Price.* (a) Progress payments on account of the Contract Price, adjusted as herein provided, shall be made to the Contractor by the Owner and the Board as the Contract work progresses. \* \* \* Such progress payments shall be made at monthly intervals or at such other intervals as the parties agree and as follows:

(i) The Board shall pay the Contractor forty-nine and eight-tenths percent (49.8%) and the Owner shall pay the Contractor fifty and two-tenths percent (50.2%) of that portion of each progress payment on account of the Contract Price set out in Article I(a) hereof (excluding, however, the sum of Three Thousand Three Hundred and Sixty Dollars ($3,360) of the Contract Price for the National Defense Features incorporated in the Vessels).

(ii) The Board shall pay the Contractor forty-nine and eight-tenths percent (49.8%) and the Owner shall pay the Contractor fifty and two-tenths percent (50.2%) of that portion of each progress payment on account of the net increase in Contract Price, pursuant to Article 4 of the General Provisions, for changes in the contract work approved by the Board as eligible for construction-differential subsidy; provided, however, in the event there is a net decrease in the Contract Price on account of such changes, the amounts otherwise payable by the Owner and the Board pursuant to this Article IV shall be reduced by the respective percentages of such net decrease.

\* \* \* \* \* \*

(v) The Owner shall pay the Contractor one hundred percent (100%) of that portion of each progress payment covering increases in the Contract Price pursuant to Article 4 of the General Provisions hereof on account of changes of the Owner approved by the Board but not approved as eligible for construction-differential subsidy; provided, however, in the event there is a decrease in the Contract Price on account of such changes, the amounts otherwise payable by the Owner shall be reduced by the amount of such decrease.[3]

\* \* \* \* \* \*

The contractor is not a party to this suit. When the dispute arose between the plaintiff and the Board, an agreement was signed between them to the effect that the plaintiff would make payments to the contractor in excess of the amounts which plaintiff contends should be paid by it and that the making of such payments should be without prejudice to the rights of the plaintiff to assert its contention in court to recover from the United States the amounts which the plaintiff claims it is entitled to as subsidy for the changes involved in this case. Consequently, we are not required to determine any rights which the contractor may have had with respect to these construction contracts. However, the pertinent provisions of such contracts, which are quoted above, are included here so that the whole picture may be presented with respect to the claim of the plaintiff for subsidy payments arising out of the changes in its vessels described above.

Each of the three construction-differential subsidy contracts contained provisions that are pertinent to this case which are the same as those set forth below from contract No. MA/MSB–20, differing only in the amount of subsidy per vessel and the percentage for changes determined by the Board to be eligible for subsidy: [4]

\* \* \* \* \* \*

ARTICLE 1. *Grant of Construction-Differential Subsidy.* (a) The Board grants, in compliance with the provisions of Sections 501 and 502 of the Act, a construction-differential subsidy to aid in the construction of the Vessels by the Owner in the total sum of the following:

(i) A sum of $5,002,073 per Vessel which is the dollar difference between (a) the Board's final determination of the estimated fair and reasonable price of $5,037,000 for constructing each of the Vessels in West Germany (exclusive of the national defense features) and (b) the fixed price bid of $10,039,-073 of the Avondale Shipyards, Inc. for the construction of each of the Vessels (exclusive of the national defense features).

(ii) A sum which shall be equal to 49.8% of the net increase in the Contract Price under Contract No. MA/MSB–19 for changes in the contract work pursuant to Article 4 of the General Provisions thereof (exclusive of changes in the national defense features, and exclusive of changes of the Owner approved by the Board as ineligible for construction-differential subsidy) approved by the Board as eligible for construction-differential subsidy and if there shall be a net decrease in the Contract Price on account of changes in the contract work (exclusive of changes of the Owner ap-

---

3. Construction contract No. MA/MSB–30 provided that the Board would pay the contractor 55 percent and the owner 45 percent of the increase in price due to changes approved by the Board as eligible for subsidy and contract No. MA/MSB–36 provided for the payment to the contractor by the Board of 53.9 percent and by the owner 46.1 percent of the increase in price due to changes found eligible by the Board for subsidy.

4. Contract No. MA/MSB–31 provided for $5,680,495 per vessel and 55 percent for changes approved as eligible for subsidy and Contract No. MA/MSB–37 provided for $5,667,159 per vessel and 53.9 percent increase for changes approved as eligible for subsidy.

proved by the Board as ineligible for construction-differential subsidy) the construction-differential subsidy granted by the Board pursuant to this Article 1(a) shall be reduced by 49.8% of said net decrease.

\* \* \* \* \* \*

ARTICLE 2. *Board's Payment of Construction-Differential Subsidy and the Cost of National Defense Features.* (a) The Board agrees to pay the Shipbuilder under the provisions of Contract No. MA/MSB–19, 49.8% of that portion of each progress payment on account of the Contract Price set out in Article I(a) of the Special Provisions of Contract No. MA/MSB–19 (excluding the sum of $3,360 which sum covers the national defense features' portion of the Contract Price).

(b) The Board agrees to pay the Shipbuilder 49.8% of that portion of each progress payment on account of the net increases in such Contract Price pursuant to Article 4 of the General Provisions of Contract No. MA/MSB–19 on account of changes in the contract work, approved by the Board as eligible for construction-differential subsidy, and in the event of a net decrease on account of changes deleting subsidized work the payments to be made by the Board as provided in (a) above shall be reduced by 49.8% of such net decrease.

\* \* \* \* \* \*

It will be observed from the foregoing provisions of the subsidy contracts that Article 1(a) (1) obligated the United States to pay a grant equal to the dollar difference between established foreign costs for building comparable ships and the cost of building the ships in the United States. These differentials were reflected in Article 2(a) of the contracts as a stated percentage of the total costs. Articles 1(a) (ii) and 2(b) provided that these same percentages were to be applied to the net increases in the contract price for changes in the contract work approved by the Board as eligible for construction-differential subsidy.

The controversy in this case arose out of a request by the plaintiff for Board approval of certain changes which will be described below that plaintiff wished to make in each of the 12 ships and that such changes be found by the Board to be eligible for subsidy. Before discussing this request and the action of the Board thereon, we would like to point out that on November 3, 1960, the Chairman of the Federal Maritime Board sent a policy guidance letter to the Committee of American Steamship Lines, of which plaintiff was a member, advising in relevant part as follows:

\* \* \* \* \* \*

On the basis that the ship owner is mutually interested in reducing shipbuilding costs and in order to establish Federal Maritime Board policy guidance to the Owner, the Board has agreed in the following:

1. In shipbuilding contracts involving the payment of Government subsidy, there will be an overall limitation of 2% of the single vessel contract price in connection with the authorization of changes under contract and approved cost settlements.

2. In exceptional cases and upon consideration of pertinent facts, the Board may during the construction of each vessel raise the limit of authority and approve cost settlements to the level it deems to be warranted by the special circumstances.

3. Where major changes are involved, even within the 2% limitation, and when such changes are warranted, the Board may approve the changes but limit the subsidy participation to the cost based on the change having been included in the original bid at time of award.

The Maritime Administration staff has been advised of these limitations. The cooperation of the Committee of American Steamship Lines in our effort to reduce changes under the contract is requested.

The plaintiff does not deny that it received this letter and we can assume that

it did receive it and was fully aware of its contents when it executed the contracts involved here.

On December 9, 1963, the plaintiff requested approval of a change to provide for the installation of four constant tension mooring winches, two forward and two aft, on the first group of four ships covered by construction contract No. MA/MSB–19.[5] On January 6, 1964, plaintiff requested approval for a similar change in the second contract. The Board approved the original requested change as eligible for subsidy on January 7, 1964, and so notified the plaintiff on the same date. Thereafter, plaintiff requested the Board to withdraw its request. This was done and on April 14, 1964, the Board cancelled its approval of the change order.

In March 1965, the plaintiff requested a change in each of the twelve ships involving the installation of a propeller-type bow thruster [6] forward and two automatic constant tension mooring winches aft, and that such changes be determined by the Board as eligible for subsidy, which, if approved, would result in an increase cost to the government of $784,168.19. The Board approved the changes, but limited the subsidy participation of the government to only what would be the current full cost as determined by the Board of installing four constant tension mooring winches (estimated at $113,941 increase cost per ship), with any excess cost for substituting a bow thruster for the two forward constant tension mooring winches, or any combination thereof in excess of the cost of four constant tension mooring winch-

es, to be for the owner's (plaintiff's) sole account. This decision of the Board was contained in a letter and a telegram dated May 18, 1965, to the plaintiff which stated in pertinent part as follows:

1. Granted approval to Lykes Bros. Steamship Company, Inc. to authorize an increased cost change under each of Construction Contract Nos. MA/MSB–19, 30 and 36, to Avondale Shipyards, Inc., for either the installation of a bow thruster forward and two constant tension mooring winches aft, or two constant tension mooring winches forward and two such winches aft, or any combination thereof.

2. Limited the subsidy participation under Construction-Differential Subsidy Agreement Nos. MA/MSB–20, 31 and 37 to only what would be the current full cost, as determined by the Board, of installing four constant tension mooring winches as a change under contract (preliminarily estimated at $113,941 increased cost per ship) with any excess cost for substituting a bow thruster for the two forward constant tension mooring winches, or any combination thereof in excess of the cost of four constant tension mooring winches, to be for the Owner's sole account.

\* \* \* \* \* \*

On the same day, May 18, 1965, the plaintiff authorized the contractor to proceed with the installation of a bow thruster assembly forward and two automatic constant tension mooring winches aft on each of the twelve ships. Thereafter, on May 28, 1965, plaintiff request-

5. With constant tension winches, the hawsers to be used are wire ropes wound on the winch drums. When moving the ship, an operator reels out the wire by manual winch control, and the wire is manhandled over the side and secured to the pier in the conventional manner. The controls are then set for a desired tension in the hawser, and the wire is automatically reeled in until this tension is developed. If the line tightens or slackens for any reason, the winch lets out or reels in to compensate while maintaining the same tension, without an operator in attendance.

6. Bow thrusters in this case are propeller devices installed in openings through the bow of ships, below the water line with blades parallel to the length of the ship. The direction of rotation of the propeller permits thrusting the bow sideways to the left or to the right for the purpose of maneuvering in docking operations or to guide the ship in confined waters.

ed the Board to reconsider its request and to approve the government's subsidy participation in full to the extent of the cost of the bow thrusters forward and two constant tension mooring winches aft instead of limiting the subsidy participation to the cost of four constant tension mooring winches. The Board denied the petition and reaffirmed its earlier action on plaintiff's request in an opinion dated August 5, 1965, Docket No. A–18, wherein the Board stated in pertinent part as follows:

The language of the construction-differential subsidy and construction contracts clearly provides that changes proposed by the operator may be authorized by the Board but approved as "eligible" *for* subsidy *or without* subsidy.

The Board has not directed Lykes to adopt *any* of the combinations of winches and bow thruster; rather, it has advised Lykes what the subsidy consequences of each combination will be. The *rate* provided in the contract will be applicable to the amount involved in the "subsidizable" combination * * *. [*Id.* at 3.]

* * * As hereinabove indicated, the contractual provisions for approval by the Board of proposed changes as eligible for subsidy imposes no obligation upon the Board to grant subsidy on any or all of the changes it is willing to permit the owner to make. The Board's willingness to grant flexibility of judgment to the owner does not require it to finance that judgment via subsidy. [*Id.* at 4.]

On August 16, 1965, the plaintiff asked the Secretary of Commerce to review the Board's denial of its request. The Secretary denied plaintiff's request for review on September 2, 1965, without an opinion. The plaintiff filed suit in this court on November 30, 1967, for the sum of $784,168.19 which it claims as damages for an alleged breach of contract by the Board, and which represents the difference between the amount that the Board would have paid as subsidy on account of the bow thruster's change had the Board paid subsidy for the full $2,-789,820 cost of installing a bow thruster and two constant tension mooring winches on each of the ships and the amount that the Board did in fact pay as subsidy in accordance with its decision to participate only on the basis of what would have been the cost of installing four constant tension mooring winches Both the plaintiff and the defendant have moved for summary judgment.

The plaintiff contends that when the Board approved the changes to allow the installation of a bow thruster forward and two constant tension mooring winches aft on each of the twelve ships, this amounted to an approval of these changes as being "eligible for subsidy" within the meaning of the subsidy contracts and the corresponding construction contracts. Accordingly, plaintiff argues, the Board was required to pay the specified percentages of subsidy based on the full cost of the changes and could not pay such percentages on a lesser cost. It points out that after the Board approved the requested changes, the government paid some subsidy on account of the changes but failed and refused to pay the specified percentages on the *full* cost of the changes and that this was a breach of the contracts. The government limited its subsidy payments to the specified percentages of what it would have cost to install four constant tension mooring winches, two forward and two aft. The plaintiff was required to pay the additional cost of substituting a bow thruster for the two forward constant tension mooring winches on each of the twelve ships. It says that the subsidy contracts required the government to pay the specified percentages on these additional costs of the bow thrusters.

The defendant, on the other hand, contends that the subsidy contracts, as well as the policy guidance letter sent by the Board to the plaintiff on November 3, 1960, clearly authorized the Board to determine the amount of the increase in the cost of the approved changes that was eligible for subsidy and the extent to which subsidy, if any, would be paid.

It argues that the Board was authorized by the subsidy contracts to approve the requested bow thruster changes and to limit the percentages of subsidy to such portion of the cost as it found eligible for subsidy. It says further that the determination by the Board of eligibility for subsidy under the contracts extended to price as well as to work, and that the limitation on subsidy participation which the Board imposed in its action of May 18, 1965, was within the authority conferred by the contracts. Furthermore, defendant contends that the determination by the Board that costs of substituting bow thrusters for the forward mooring winches in excess of the cost of four mooring winches would be "for the owner's [plaintiff's] sole account" was tantamount to a determination that such excess costs were not eligible for subsidy participation, and that this decision was authorized by the contracts. It is the position of the defendant that the action taken by the Board was within the power and discretion conferred upon it by the contracts, and, accordingly, there was no breach of contract. We agree with these arguments of defendant for reasons discussed in the following paragraphs.

Both the plaintiff and the defendant urge that our decision in Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 183 Ct.Cl. 358 (1968), controls the decision in the instant case. We agree. Of course, plaintiff and defendant give different reasons for citing that case in support of their respective positions here, as will be shown below.

In the *Sun* case, the contractor (The Sun Co.) sued the government for a breach of contract of a ship construction contract between it, the government, and the owner, which was practically identical to that involved here. The owner of the ship, American Export Isbrandtsen Lines, Inc., hereinafter called Export, was made a party to the suit and the government asked for judgment over against it for any amount *Sun* might recover against the government. The facts there showed that Export had a construc-

tion-differential subsidy contract with the Maritime Subsidy Board for the construction of four ships, which, except for prices and percentages, was practically identical with the subsidy contracts in the instant suit. Export had received the policy guidance letter of November 3, 1960, from the Board, but it was not sent to the Sun Company. During the course of construction of the ships, Export asked the Board to approve changes in the ships so as to allow the installation of refrigerator cargo space in each of them. The Board authorized the changes but limited the subsidy participation in the cost of the changes to what the Board determined the cost would have been had the work been included in the bidding plans and specifications. Export protested this limitation on the subsidy participation by the Board, but authorized the contractor to make the changes. When the government failed to pay subsidy on the full cost of the changes, the contractor filed suit against it for breach of its ship construction contract. Export was made a party as aforesaid and it asserted its construction-differential subsidy contract as a defense to the government's suit over against it.

In Part I of our opinion in that case, we held that the ship construction contract provisions with respect to subsidy participation by the government were ambiguous and could be interpreted so as to support the contentions of both the shipbuilder and the government. This being the case, and since the shipbuilder (The Sun Co.) had not received the 1960 policy guidance letter from the Board and had no advance information as to how the Board would interpret the subsidy provisions, we held that the ambiguity must be decided against the government because it drafted the contract, citing Bennett v. United States, 371 F.2d 859, 861, 178 Ct.Cl. 61, 64 (1967). The court there said:

* * * According to this view, when Marad approved the change in work, it became bound to pay 48 percent of the total increase in the cost of the

work resulting from the change. [*Id.*, 393 F.2d at 816, 178 Ct.Cl. at 373.]

Judgment was accordingly entered for the shipbuilder against the government.

It is obvious that the plaintiff in the instant case relies on Part I of our opinion to support its claim here. Its confidence in that part of the opinion is misplaced. There we were interpreting the ship construction contract and the rights, duties, and obligations of the shipbuilder and the government thereunder. Here we are concerned with an interpretation of the construction-differential subsidy contracts (not the ship construction contracts) and the rights, duties, and obligations of the owner (not the shipbuilder) and the government under such contracts. It appears that the plaintiff's claim here is not governed by Part I of our opinion in the *Sun* case, but by Part II.

In Part II of our opinion in that case, after pointing out that the owner had argued that the subsidy contract must be interpreted to mean that once the Board approved a change in work, it had to automatically pay 48 percent of the increase in the contract price, or pay none of it, and that it could not pay subsidy on a part of the increased price (which is the same argument the plaintiff makes in the instant case), we said:

* * * We held that this interpretation of the contract was reasonable as to Sun, but we are required to take a different view with respect to Export. This is partly because the subsidy contract between Export and Marad, to which Sun was not a party, indicates that Marad was given the authority by the contract to determine that certain increases in the contract price were eligible for subsidy and that others were ineligible. This extended to price as well as to work. If this were not so, the provisions in Articles 1 and 2 of the subsidy contract, *supra*, excluding changes approved by Marad as ineligible for subsidy would be meaningless. See AMP Incorporated v. United States, 389 F.2d 448, 454–455, 182 Ct.Cl. 86, 96 (1968).

If this is not enough, the question is laid to rest by the policy guidance letter, *supra*, that was sent to Export, among others, by Marad on November 3, 1960, before the instant contracts were executed. That letter specifically stated " * * * in order to establish Federal Maritime Board *policy guidance* to the Owner [Export here], the Board has agreed in the following: * * * *the Board may approve the changes but limit the subsidy participation to the cost based on the change having been included in the original bid at the time of award.*" (Emphasis supplied.)

When the contracts were executed, Export was familiar with this policy guidance letter and knew the meaning that Marad gave to the various Articles of the contracts. Export knew full well the meaning that Marad intended to convey in the cited Articles of the contract, because the policy guidance letter had fully informed Export. Consequently, when Export received the telegram from Marad of January 28, 1963, *supra*, stating that subsidy participation in cost of change will be based on amount it would have been had work been included in bidding plans and specifications, it knew that Marad was acting in accordance with the contracts and that the contracts authorized Marad to take the action set forth in the telegram.

This court stated in Cresswell v. United States, 173 F.Supp. 805, 811, 146 Ct.Cl. 119, 127 (1959):

*If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true if he had reason to know what the other party intended.* (Cases omitted.) (Emphasis supplied.)

See also The Franklin Co. v. United States, 381 F.2d 416, 180 Ct.Cl. 666 (1967); City of Memphis, Tenn., etc.

v. *Ford Motor Co.*, 304 F.2d 845, 849 (6th Cir. 1962).

In our opinion, Export knew the meaning Marad intended to convey by the provisions of the contracts at the time they were executed and was bound by that meaning. At least it had reason to know what Marad intended. [*Id.*, 393 F.2d at 817–818, 178 Ct.Cl. at 375–377.]

We held further in that case that even if the contracts were ambiguous, their interpretation by the owner (Export) was unreasonable and that of the Board reasonable because "we can look to the policy guidance letter [of November 3, 1960] to determine their meaning." We said, with reference to the Board's interpretation of the contracts:

> * * * It [the Board] was correct in its interpretation of the contracts as imposing liability upon it for only 48 percent of the increased contract price which it approved *to the extent* or *insofar as eligible* for construction-differential subsidy because of the change in work. [*Id.*, 393 F.2d at 818, 178 Ct. Cl. at 377.]

We pointed out that if Export was uncertain as to the Board's construction of the contracts before they were executed, it was put on inquiry by the 1960 policy guidance letter, and that it must be assumed that it knew and acquiesced in the proposition it would be required to pay all of the increase in price due to the changes over and above the amount stated in the Board's telegram to be eligible for subsidy.

In the *Sun* case, judgment was entered in favor of the government against the shipowner (Export).

We conclude that our holding in Part II of the *Sun* case is dispositive of the case before us. Everything we said there could be said here because it is equally as applicable to the instant case.

7. The facts here show that at the time plaintiff requested approval of the changes, the Board had already approved changes amounting to 4.54 percent of the cost of the ships under contract MA/MSB–19, and 4.37 percent of the

The plaintiff attempts in various ways to distinguish its case from Part II of the *Sun* case. In the first place, it contends that the 1960 policy guidance letter was not applicable here because the Board did not limit its subsidy participation to the specified percentages of what it would have cost if the bow thruster changes had been included in the original bid at the time of the award as stated in the 1960 letter. We do not think this is a valid argument. The importance of the 1960 letter was that it put the plaintiff on notice that the Board interpreted (or would interpret) the subsidy participation provisions of the contracts so as to allow it to approve changes but allow it to limit subsidy participation to a percentage of less than the full cost of changes.

A similar argument was made by plaintiff with reference to the limitation in the 1960 policy letter on subsidy if changes exceeded 2 percent of the cost of the vessel, unless the Board, in exceptional cases, raised the cost settlement to the level it deemed warranted by the circumstances.[7] The plaintiff says the Board did not base its subsidy limitation on this 2 percent provision. Here again, it must be said that the policy guidance letter put the plaintiff on notice that the Board interpreted the subsidy contracts in such a way as to allow it to approve changes and at the same time limit its subsidy participation to a percentage of a lesser amount than the full increase in cost due to the changes. The plaintiff signed the contracts with this knowledge. As a matter of fact, the Board did not give any reason for its action nor state on what basis it was limiting its subsidy participation in its decision of May 18, 1965. It may have had more than one valid reason, including the 2 percent limitation (which alone would have been sufficient), but that is not material. The important fact is that it reserved

cost of ships under contract MA/MSB–30, and 0.18 percent of the cost of ships under contract MA/MSB–36, and the bow thruster change on MA/MSB–36 ships would exceed the 2 percent limitation.

unto itself the right and power to limit subsidy participation to an amount less than the cost of the changes and in effect so advised the plaintiff before the contracts were signed. The plaintiff executed the contracts with this knowledge and is deemed to have acquiesced in the arrangement.

The plaintiff says that the Board's limitation of its subsidy participation is invalid because it is based on the cost of installing four mooring winches on each ship when the plaintiff did not ask for them but asked for a bow thruster and two mooring winches instead. It is clear that the Board was merely using the cost of installing the four mooring winches (which plaintiff originally requested and then cancelled the request) for the purpose of arriving at a price which it determined was eligible for participation subsidy. The Board was willing to approve the bow thrusters and two mooring winches per ship as a change if the plaintiff desired to pay the balance of the cost of the change over and above the cost of installing four mooring winches per ship.

The next argument of the plaintiff is that the 1960 policy guidance letter from the Board should not be material here because it had been superseded by other and later policy statements issued by the Board. It points to one such statement in particular, namely, a Board "policy" published in "proposed" form on March 2, 1965 (30 Fed.Reg. 2681) that was adopted on September 9, 1965, and published on September 15, 1965 (30 Fed.Reg. 11756) which stated:

* * * Other nonstandard equipment or shipbuilding components shall be eligible for CDS, [Construction-differential subsidy] only if * * * it can be demonstrated with reasonable certainty that the added investment will produce a return to the owner of at least 10 percent per annum after taxes over the life of the investment. * *

Plaintiff alleges that its requested bow thrusters met the requirements of this statement and were therefore eligible for subsidy. It says its position in this regard is further supported by the fact that on June 1, 1965, the Board issued "Standard Specifications for Cargo Ship Construction" which included specifications for bow thrusters. We do not think this argument is valid for several reasons, namely, (1) The alleged "new policy" was adopted after the contracts in issue here had been executed; (2) The request of plaintiff for the bow thruster change had already been denied full subsidy participation by the Board (May 18, 1965); (3) It (the new policy) was to operate prospectively and not retroactively, and (4) If it was a "new policy" it was in addition to that set forth in the policy guidance letter of November 3, 1960, and not in lieu of it. There is no evidence that the 1960 policy was ever repealed, cancelled, withdrawn or revoked. Consequently, we must assume that it was in force and applied to this case where relevant.

Another contention of the plaintiff is that the Board denied it full subsidy participation on the bow thrusters because of a unilateral "moratorium" declared by the Board on changes in vessels being constructed under subsidy contracts because of a shortage of funds. Plaintiff says this was arbitrary, unauthorized, an abuse of discretion, and invalid. It points to the fact that the Board adopted such a moratorium on March 24, 1965, "for the remainder of the current fiscal year," and plaintiff was advised of it by letter dated April 1, 1965. On July 28, 1965 (after the end of the previous fiscal year on June 30, 1965), the Board extended the moratorium "until fiscal year 1966 appropriations are finally determined, at which time the issue will be reexamined." The plaintiff complains that even after the 1966 appropriations for the Board became final and there was no longer a shortage of funds, the Board still refused to reconsider its bow thruster request and continued to deny it. The defendant denies that the Board based its decision on the moratorium and says that even if it had done so its action would

have been authorized by the contracts. We do not have to decide this question, although a shortage of funds might well be a valid reason to limit subsidy participation under the contracts. The Board did not state in its denial of plaintiff's request on May 18, 1965, that it was doing so because of the moratorium. We find no evidence that it based its decision on the moratorium. We conclude that the action of the Board was not arbitrary nor an abuse of discretion, but was a valid exercise of the authority conferred upon it by the contracts.

The case has been well briefed and forcefully argued by counsel for both parties, and this has been of great assistance to the court. It is our opinion, however, that the law is with the defendant for all of the reasons stated herein.

Accordingly, plaintiff's motion for summary judgment is denied, and that of the defendant is granted, and plaintiff's petition is dismissed.