The UNITED STATES, Appellant,

v.

HUMAN RESOURCES MANAGEMENT, INC., Appellee.

Appeal No. 84–522.

United States Court of Appeals, Federal Circuit.

Oct. 3, 1984.

Alvin A. Schall, Washington, D.C., argued, for appellant.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Alexander Younger, Washington, D.C. were on the brief, for appellant.

Stephen L. Wilson, Attorney-Advisor, Agency for Intern. Development, Washington, D.C., of counsel.

C. Richard Boehlert, Falls Church, Va., argued, for appellee.

Before FRIEDMAN, BENNETT and NIES, Circuit Judges.

FRIEDMAN, Circuit Judge.

This is an appeal by the United States from a decision of the Armed Services Board of Contract Appeals (Board) (1) converting the government's termination of a contract for default into a termination for the convenience of the government and (2) determining that the contractor is entitled to receive an increase in the amount of its indirect costs of performing the contract. 83–1 BCA ¶ 16,526. We reverse on both issues.

I

A. The rather complex factual background involved in this appeal is fully set forth in the Board's opinion. We present here those facts most salient to our disposition of the case.

Both issues arise out of the same contract (the contract). The contract, entered into in January 1981, was between the Agency for International Development (AID) and the Small Business Administration (SBA). SBA agreed to provide the services the contract covered by subcontracting for them with the appellant, Human Resources Management, Inc. (Resources). SBA delegated to AID "the responsibility for administering the subcontract."

The contract was of the cost reimbursement type. Resources was to be paid its costs of performance plus a fixed fee. The contract provided for the establishment of negotiated provisional rates covering Resources' overhead costs, which were subject to change through negotiation. *See* Part IIIA, *infra*. Under the contract, AID was to make progress payments to Resources as the work progressed.

The contract arose as part of an effort by AID .to explore the value of advanced communications technology, including satellites, for "extending and improving education, health, and agriculture services to

rural communities" in less developed countries. The project, a cooperative effort with the government of Peru, involved installing equipment in three remote Peruvian cities, developing uses for the equipment, and testing any improvement the project caused.

Resources was required to provide various kinds of technical assistance to the Peruvians, including training, coordination, and engineering support services. The contract also required Resources to evaluate the effectiveness of the program and to disseminate the results to other Latin American governments.

The contract further provided:

In order to assure objectivity, the contractor shall carry out a substantial portion of evaluation activities through a subcontractor with appropriate experience in evaluation of development communication projects in Latin America.

Resources selected Florida State University (the University) as the subcontractor.

Delays plagued the performance of the contract, primarily because the communications equipment central to the project was not purchased and installed in a timely manner. Resources and the University could not perform many of their functions until AID and the government of Peru approved the equipment design and specifications and the installation sites. Other functions depended upon the equipment actually being in place. Changes in the equipment specifications and installation sites, often emanating from Peru, delayed nearly all aspects of the contract. Moreover, Resources had to coordinate the procurement of the equipment—work not specified in the contract—for which it received reimbursement.

The delays caused severe cash flow problems for Resources, largely because its overhead and general and administrative expenses (indirect costs) greatly exceeded anticipated levels. As a result, Resources did not pay the University amounts due under the subcontract. Resources, however, billed the government for the amounts due to the University and the government paid Resources those amounts.

On March 17, 1982, the University wrote to the contracting officer informing him that Resources had failed to pay eight invoices totalling more than $36,000 for work through January 1982. The University threatened to stop work on March 26, 1982, if the invoices remained unpaid.

On March 24, 1982, the contracting officer sent a "cure" letter to Resources. After noting that a "work stoppage by Florida State would adversely affect performance of [the] contract," the letter stated that Resources could bill the government only for "expenditures made during the period covered." It further stated that since Resources had not paid the University, "the validity of [Resources'] voucher certification that the sum claimed is 'proper and due' is in doubt." The letter concluded with a warning that failure to cure the deficiencies within ten days could result in termination of the contract for default.

Although Resources assured the government that it had taken definitive action to cure the deficiency, Resources apparently did no more than promise the University that it would be paid. After discussing the problem with the contracting officer, the University terminated the subcontract on May 7, 1982, because of Resources' continued failure to pay the invoices. On June 4, 1982, the contracting officer terminated the contract for default. The validity of this termination is the first issue in the case.

The second issue involves the amount of allowable overhead under the contract. In late May 1982, Resources informed the contracting officer that its actual indirect costs exceeded the provisional rates specified in the contract. Resources sought, as the contract apparently permitted, to amend the rates in order to permit reimbursement of its actual expenditures.

Although AID's Overhead and Special Cost Branch approved the increase, the contracting officer denied it. The contracting officer interpreted the contractual provision setting negotiated provisional overhead rates as establishing a ceiling on

those rates, which could be adjusted down but not up.

B. Resources appealed to the Board both the default termination and the refusal to allow increased indirect costs. The Board reversed both decisions of the contracting officer.

The Board held that the government had failed to prove that Resources either had breached any specific provision of the contract or had endangered performance—the two grounds under the contract that justified the government in terminating for default. *See* Part IIA, *infra*. It ordered the contracting officer to convert the termination for default into a termination for the convenience of the government.

The Board further held that under the contract the provisional overhead rates were subject to upward renegotiation in the light of the actual experience under the contract. The Board refused to consider the government's parol evidence that the parties understood that the provisional rates for overhead set a ceiling on those changes, on the ground that the contractual provisions were unambiguous.

## II

A. The General Provisions, Cost Reimbursement Type Contracts, incorporated in this contract by reference, provide for termination for default.

> [w]henever the Contractor shall default in performance of this contract in accordance with its terms (including in the term "default" any such failure by the Contractor to make progress in the prosecution of the work hereunder as endangers such performance), and shall fail to cure such default within a period of ten days (or such longer period as the Contracting Officer may allow) after receipt from the Contracting Officer of a notice specifying the default ....

General Provisions, ¶ 23(a), *reprinted in* 41 C.F.R. § 7–7.5001–23 (1983) (incorporating by reference § 1–8.702(a)).

The Board held that the government neither alleged nor proved that Resources had "default[ed] in performance of this contract in accordance with its terms." It stated:

> Respondent's default termination in the instant appeal does not rest on the breach of a particular contract provision requiring a contractor's timely payment of subcontractor costs, the violation of which justifies termination for default in accordance with its terms, nor have we found such a provision in the contract.

*Apepals of Human Resources Management, Inc.,* Nos. 27297, 27561, slip op. at 12. 83–1 BCA 82,158. We hold, however, that Resources breached specific provisions of the contract and that that breach justified the government's termination for default.

General Provision 9 of AID cost reimbursement contracts provided for monthly payments to the contractor:

> Once each month ... the Contractor may submit to [AID] Voucher Form SF 1034 ... in the amount of dollar expenditures made during the period covered
> ....

General Provisions, ¶ 9(b)(1), *reprinted in* 41 C.F.R. § 7–7.5001–9(b)(1) (1982). The contract further required that the contractor "certif[y]: (A) That payment of the sum claimed under the cited contract is proper and due and that appropriate refund to AID will be made promptly upon request in the event of disallowance of costs not reimbursable under the terms of the contract ...." *Id., reprinted in* § 7–7.5001–9(b)(1)(ii).

Under these provisions, Resources was entitled to receive from the government reimbursement of only those "expenditures made" during the preceding month. When Resources certified that payment of the amounts claimed was "proper and due," as it did in this case with respect to the amounts in dispute, it necessarily certified that those amounts covered expenditures actually "made." Those were the only amounts for which Resources was entitled to reimbursement.

The words "expenditures made" are not ambiguous; they refer to money Resources

actually paid out in the prior month. The words stand in sharp contrast to such phrases as "incurred costs," which incorporate the principles of the "accrual method of accounting," 41 C.F.R. § 1–30.509–5(a) (1983), and which may cover costs incurred but not yet paid.

Resources concededly had not paid the University in the month preceding each voucher for which it sought and obtained reimbursement. (Indeed, Resources did not even pay the University out of the proceeds it received for each voucher.) Resources' vouchers thus covered sums that were not "proper and due." By filing such false vouchers, Resources breached those provisions of the contract. That breach justified the contracting officer's termination of the contract for default.

Resources' argument that no "term in this contract ... requires the contractor to pay his subcontractor within any particular period of time" is beside the point. That fact did not excuse Resources' obtaining reimbursement from the government for expenditures it had not made in the preceding months. For the same reason it is irrelevant whether, as Resources contends, AID caused Resources' default by not procuring the equipment or designating installation sites in a timely manner, by asking Resources to perform procurement work outside the scope of the contract, and by interfering in other ways with the orderly progress of the work. Equally irrelevant is Resources' claim, made at oral argument, that the government's failure to renegotiate the indirect costs prevented Resources from paying the University. None of these points warranted Resources' certification as "proper and due" amounts covering expenditures Resources had not previously made.

At one point in oral argument government counsel appeared to concede that Resources had not made any false statement in its certification. Those remarks, however, apparently were based upon a loose and inaccurate paraphrase of the contractual language. Viewed in context, the statement did not evince any intention by the government to concede the certification point.

Government counsel stated that the amounts Resources owed the University were "expenses incurred" and therefore were "due and owing." He did not concede that the amounts constituted "expenditures made" or were "proper and due." Moreover, at a later point in his argument, government counsel made clear that the government was not conceding the issue. He stated that Resources "could only bill for expenses incurred during the period covered by the vouchers" and "had to certify and provide the vouchers showing the subcontract expense."

■ B. Resources contends that the cure notice did not "set forth in concise but complete form all of the provisions of the contract which the contractor has failed to meet." 41 C.F.R. § 1–8.602–3(b) (1983).

The cure notice opened with an unambiguous statement of Resources' default: "you have failed to reimburse Florida State University for services provided by them under the HRM/FSU subcontract." The letter then "set forth ... the provisions of the contract" upon which the government relied:

> Moreover, ... HRM has billed AID and received reimbursement for subcontract costs. As indicated in paragraph (b)(1) of General Provision No. 9, entitled "Allowable Cost, Fixed Fee, and Payment", your vouchers may be submitted "... in the amount of dollar expenditures made during the period covered ...." While it is recognized that your accounting system is on an accrual basis, you may not be delinquent in payment of costs of contract performance in the ordinary course of business. Therefore, the validity of HRM's voucher certification that the sum claimed is "proper and due" is in doubt.

Finally, the letter warned Resources that failure to "cure the deficiencies ... within ten days" could result in termination for default. In fact, the contracting officer waited until June 4, 1982—more than two

months—before taking final action to terminate the contract.

There were no ambiguities in this notice, and the Board did not discern any. The notice informed Resources that it must pay the University and, in the future, should submit vouchers only for "expenditures made." Resources does not claim that, after it received the notice, it failed to reimburse the University only because it did not know that it was required to do so. The notice could not have created any doubt or left any uncertainty that to cure its default Resources was required immediately to pay the University the amount owed (for which Resources already had received reimbursement) and to seek further reimbursement only for amounts already paid to the University.

■ C. Resources also contends that the delays caused by the government reduced its direct costs and thereby reduced the amount reimbursed as overhead, which is computed on the basis of direct costs. The Board, however, did not so find. To the extent these facts might excuse Resources' breach, Resources had the burden of proof on this defense. On this record, we cannot say that the Board erred in failing to hold for Resources on this basis.

■ D. Finally, Resources asserts that the contracting officer did not follow the proper procedure in terminating the contract for default because he failed to comply with the contractual requirement that he notify SBA before terminating the contract. Resources relies upon the provision of the contract under which SBA "delegate[d] to [AID] the responsibility for administering the subcontract" between the SBA and Resources, and which further provided that

AID shall give advance notice to the SBA before it issues a final notice terminating the right of the subcontractor to proceed with further performance, either in whole or in part, under the subcontract for default or for the convenience of the Government.

This provision, however, was part of the contract between SBA and AID. Resources was not a party to that contract, but entered into its own separate contract with SBA to perform the services the SBA–AID contract required.

There is no indication that the provision requiring AID to notify SBA before terminating the subcontract between SBA and Resources was intended for the benefit of Resources. To the contrary, the provision appears designed merely to insure that SBA would receive notice before AID terminated a contract of SBA that it was administering. Nothing in the record supports Resources' assertion that this provision was included in the contract to give SBA the opportunity to intervene with AID on behalf of Resources or otherwise to help Resources before AID terminated the contract.

Moreover, the record shows and Resources concedes that the contracting officer notified SBA of AID's intention to terminate the contract the day before AID took that action. The contract does not specify how long before termination the notice must be given. We cannot say that the notice the contracting officer gave SBA did not comply with the contractual requirement.

Resources correctly points out that the brief time between AID's notification to SBA and the actual termination did not give SBA any meaningful opportunity to intervene with AID on behalf of Resources or otherwise to aid that company. The point is irrelevant, however, because it is based upon a view of the purpose of the notice provision that we have rejected.

E. In view of our conclusion on this issue, we have no occasion to consider the government's argument that, by failing to pay the University, Resources breached another provision of the contract requiring it to "manage" the subcontract with the University.

### III

■ A. Article VIII of the contract established the rate of reimbursement for indirect costs.

Pursuant to the provisions of the Clause of the General Provisions of this contract entitled "Negotiated Overhead Rates," a rate or rates shall be established for the period beginning January 1, 1981 and ending December 31, 1981. Pending establishment of final overhead rates for the initial period, provisional payments on account of allowable indirect costs shall be made on the basis of the following negotiated provisional rates applied to the base(s) which are set forth below:

| | Rate | Base | Period |
|---|---|---|---|
| Overhead (Home Office) | 85% | Direct Salaries of Home Office Personnel | Feb. 1, 1981, until amended |
| Overhead (Overseas) | 40% | Direct Salaries of Field Staff Personnel | Feb. 1, 1981, until amended |
| G&A [General and Administrative] | 18.5% | Total Costs excluding G&A expenses. | Feb. 1, 1981, until amended |

In no event shall reimbursement of allowable indirect costs exceed the rates set forth above.

The General Provisions referred to in Article VIII provided for negotiation of final reimbursement rates for indirect costs after each fiscal year in order to reflect the contractor's actual indirect expenses. General Provisions, ¶ 10(b), *reprinted in* 41 C.F.R. § 7–7.5001–10(b) (1983).

The Board held that in view of the General Provision providing for renegotiation, the rate limitations in Article VIII applied only until the parties had negotiated final rates, and that such final rates may exceed the provisional rates that Article VIII specified. We disagree with the Board's interpretation of the contract.

The specific provisional overhead rates were set in negotiations between the parties. After stating that the provisional rates would be paid "[p]ending establishment of final overhead rates for the initial period," the contract stated: "In no event shall reimbursement of allowable indirect costs exceed the rates set forth above."

We think this language established that the final negotiated rates could not exceed the provisional rates set forth in Article VIII. That is precisely what the contract says. The introductory phrase "[i]n no

event," immediately following the specification of the negotiated provisional rates that were to be replaced by final rates to be negotiated pursuant to the General Provisions, shows that the final rates were not to "exceed the rates set forth above," namely, the provisional rates. The words "[i]n no event" presumably were included in Article VIII to refute any claim that the final rates could exceed the provisional ones.

In short, Article VIII sets a ceiling on the allowable rates for overhead, which the final rates could not exceed. The final rates could be less than the provisional rates, but not greater than them.

B. Our interpretation of the contract is confirmed by parol evidence showing the parties' intention when they entered into the contract. Although the Board refused to consider this evidence because it viewed the contractual provisions as unambiguously permitting final rates to exceed the provisional rates, our view of the contract is that, if the provisions are unambiguous, they unambiguously produce the contrary result. In any event, we cannot say that the language is so clear as to preclude resort to parol evidence. Indeed, in its brief, Resources characterizes the final 15 words of Article VIII that begin with "[i]n no event" as "this ambiguous sentence."

The parol evidence shows that the parties understood when the contract was negotiated that the provisional rates in Article VIII set a ceiling on reimbursement of overhead costs.

In a letter of June 1, 1982, Resources' president, Gary Thomas, stated to Wesley Hawley, the contracting officer, that "we recognize the Peru contract has indirect costs ceilings based upon assumptions at the time the contract was negotiated . . . ." Robert Schafer, Director of Resources' Human Resources Division and its principal negotiator on this project, admitted that "[d]uring negotiations I was told that AID intended to impose an absolute ceiling on the indirect rates." Mr. Bergman of AID testified:

the audit report recommended negotiation of ceilings on reimbursement of indirect costs. I brought this to Mr. Schafer's attention and Mr. Schafer agreed to utilize 85 percent labor over—home office labor over head [sic] as a ceiling, 40 percent field over head [sic] as a ceiling and 18.5 percent GNA [sic] as a ceiling. Dr. Martin, the University's representative at the negotiations, corroborated both statements: "I recall that everybody present clearly and explicitly agreed that an overhead ceiling rate was desirable."

Resources was aware when it signed the contract that the government viewed the provisional rates for overhead as providing a ceiling on those rates. Having thus acquiesced in that interpretation, Resources is bound by it. *Perry and Wallis, Inc. v. United States,* 192 Ct.Cl. 310, 427 F.2d 722 (1970); *Lykes-Youngstown Corp. v. United States,* 190 Ct.Cl. 348, 420 F.2d 735, *cert. denied,* 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970).

In light of the parol evidence and the contractual provisions discussed in Part IIIA, there is no basis for Resources' claim that although the parties agreed upon ceiling rates, the contract itself did not provide for them. As we have explained, the provisional rates for overhead set in Article VIII were the ceiling on such rates.

## CONCLUSION

The decision of the Armed Services Board of Contract Appeals is reversed.

REVERSED.

NIES, Circuit Judge, dissenting.

I disagree that "it is irrelevant whether ... AID caused Resources' default." As the majority recognizes in its discussion of the facts, delays in the purchase and installation of communication equipment prevented Resources from performing the evaluation specified in the contract. The ASBCA found in this regard that:

> The delays were due to the increasing complexity and uncertainty of the final design of the hardware and equipment,

design configuration changes required by the Government of Peru, uncertainties regarding potential applications, delays in negotiations with the hardware and equipment supplier because of the design configuration changes, and delays in identifying villages that delayed the collection of baseline data.... Respondent admitted that *none of these delays in the entire project were the fault of appellant, but rather they resulted from* the complicated nature of an experimental program and *many factors which were not anticipated by AID* and the Peruvian Government at the inception of the project. [Emphasis added.]

The ASBCA also found that at least part of the delay was caused by the government's failure to award the actual subcontract for the procurement of the necessary hardware and equipment until approximately ten months after the award of the contract under appeal. Resources, frustrated by the delay and facing severe cash flow problems resulting from the accrual of overhead costs, was forced to undertake the task of coordinating the procurement of the necessary hardware itself in an effort to prevent total collapse of the project. Despite these efforts, which were not required by the contract, Resources' financial situation continued to worsen, resulting in its inability to pay FSU in a timely manner.

AID's inaction during this time period was not "irrelevant", but rather was the direct cause of Resources' "default". The evidence also indicates that AID was quick to take advantage of the situation in an effort to rid itself of Resources as the "middleman", so that it could contract directly with FSU. Following a series of meetings between AID and FSU concerning Resources' payment problems under the subcontract, AID's contracting officer wrote the General Counsel of FSU, stating in part:

> As I explained to Dr. Johnson during his recent visit, if FSU terminates it's [sic] relationship with HRM I may look at the option of terminating that portion of the HRM contract and obtaining the services

via a direct contract. However, any action on my part beyond encouraging HRM to rectify the matter, is dependent upon action taken by FSU.

Three days later, in response to this "encouragement", FSU terminated its contract with Resources. AID then proceeded to terminate its contract with Resources, and subsequently, awarded the contract for evaluation services directly to FSU.

Because AID's action (or more correctly, inaction) lead directly to a situation in which Resources was unable to keep current with its payments to FSU, and because AID took advantage of that situation by terminating the contract with Resources so that it could contract directly with FSU, I would hold that AID had not met its burden of showing that the termination was proper, and would affirm the decision of the ASBCA.

I also agree with the ASBCA's interpretation of the contract on overhead rates. The rates set forth in Article VIII of the contract represent only the negotiated *provisional* rates for the initial period pending establishment of final overhead rates. As the ASBCA noted, General Provision 10, "NEGOTIATED OVERHEAD RATES" provides for the negotiation of final overhead rates based on the contractor's actual (rather than estimated) cost experience during the fiscal year.

Evidence in the record indicates that Resources' difficulties in making payments to FSU were largely attributable to the unreimbursed indirect costs being incurred as a result of delays in the project. The contracting officer terminated the contract believing it to be "grossly unfair" for Resources to delay payments to FSU in anticipation of reimbursement of these indirect costs. The contracting officer assumed that since these costs exceeded the contract indirect cost "ceiling", they were not in any event reimbursable. Under my view that the ceiling only applied to the provisional rates, the contracting officer's reasoning provided no justification for terminating the contract.

For the above reasons, I would affirm the decision of the ASBCA in all respects.