**SUN SHIPBUILDING AND DRY DOCK COMPANY, American Export Isbrandtsen Lines, Inc., Third-Party Intervenor**

v.

**The UNITED STATES.**

No. 169–65.

United States Court of Claims.
April 19, 1968.

Richard W. Kurrus, Washington, D. C., attorney of record, for plaintiff. Kurrus & Jacobi, of counsel.

Harvey M. Katz, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Franklin G. Hunt, New York City, attorney of record, for intervenor-third-party defendant, Lord, Day & Lord, New York City, of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

SKELTON, Judge.

The plaintiff, Sun Shipbuilding and Dry Dock Company (hereinafter called Sun), a shipbuilding contractor, filed this suit against the United States pursuant to 28 U.S.C. § 1491, for damages in the sum of $217,200 for an alleged breach of contract to pay ship construction subsidy on three ships it had constructed for American Export Isbrandtsen Lines, Inc. (hereinafter called Export), the owner of the vessels. The United States, defendant, made Export a

third-party defendant and asked for judgment over against it for any amount that Sun might recover against defendant. Thereafter, Export intervened, denying liability and asking the court to enter judgment in favor of Sun against the defendant.

All three parties filed motions for summary judgment and oral argument was heard by the court. After argument of the parties, the court denied all motions, without prejudice, and remanded the case to the commissioner for further evidence and proceedings and ordered the filing of additional briefs. Thereafter, the parties filed a stipulation of facts, waived further argument and the filing of additional briefs, and renewed their motions for summary judgment. The commissioner returned the case to the court and it is now before us on the motions for summary judgment. The case involves the following basic facts.

Plaintiff Sun is, and at all times hereinafter mentioned was, a corporation organized and existing under the laws of the State of Pennsylvania. Its main office and plant is in Chester, Pennsylvania.

Defendant United States of America has in all matters hereinafter mentioned acted through its agencies, the Federal Maritime Board and the Maritime Administration, both created by Reorganization Plan No. 21 of 1950, 64 Stat. 1273, note following 46 U.S.C. § 1111. Pursuant to Reorganization Plan No. 7 of 1961, 75 Stat. 840, note following 46 U.S.C. § 1111, the Federal Maritime Board was abolished and certain of its functions, including those with respect to the award and performance of subsidy contracts, were transferred to the Secretary of Commerce. (Those Federal Maritime Agencies acting on behalf of the defendant United States are hereinafter sometimes referred to as Marad).

Export is, and at all times hereinafter mentioned was, a corporation organized and existing under the laws of the State of New York. Export entered into the contracts hereinafter mentioned under the name American Export Lines, Inc.

which was its name at such time, but which was subsequently changed to American Export Isbrandtsen Lines, Inc. The company has an office and principal place of business at 26 Broadway, New York, New York.

On November 30, 1959, Export, pursuant to Title V of the Merchant Marine Act, 1936, 49 Stat. 1995, as amended, 46 U.S.C. §§ 1151–1161 (hereinafter the Act), as amended, filed an application with Marad for construction-differential subsidy for the construction of four C3–S–46b class cargo vessels.

The plans for the vessels in the original application provided for built-in refrigerated cargo space in the amount of 31,540 cubic feet for each vessel. However, Export requested that the refrigerated cargo space be eliminated from the plans and this request was approved by Marad on September 22, 1960. The vessel plans, as revised, were published in accordance with the Act for competitive bids, and invitations for bids, including copies of the vessel plans and specifications, were sent to various shipyards, including Sun. Export, however, informed Marad that as a precaution it had allotted space for future installation of refrigerated cargo machinery in case the volume of such cargo were to justify a permanent refrigerated cargo installation.

On November 3, 1960, the then Chairman of the Federal Maritime Board sent the following letter to the Committee of American Steamship Lines, of which Export was then a member, for the purpose of establishing Federal Maritime Board policy guidance to the owners, including Export:

There appears to be a growing tendency upon the part of some operators to request substantial changes in design for new ships after construction contracts are awarded.

Cargo ships currently being constructed under the replacement program represent considerable effort on the part of the design agent and the operator's staff. They are generally

fitted out with more elaborate equipment than their European counterparts with the view of reducing labor or cargo handling costs. This is proper when economically justified.

During the recent weeks, the Board, in connection with the cargo ship replacement program, has acted on several Changes Under the Contract involving considerable sums of money in which the Government subsidy participation is requested. In reviewing these several changes, the Board considered that the Owners' and the Government's interests are best served if modifications be reduced to an absolute minimum. As a normal procedure it is expected that the design will be finalized before requesting bids. Modifications made after award do not have the full advantage of competitive bidding.

On the basis that the ship owner is mutually interested in reducing shipbuilding costs and in order to establish Federal Maritime Board policy guidance to the Owner, the Board has agreed in the following:

1. In shipbuilding contracts involving the payment of Government subsidy, there will be an overall limitation of 2% of the single vessel contract price in connection with the authorization of changes under contract and approved cost settlements.

2. In exceptional cases and upon consideration of pertinent facts, the Board may during the construction of each vessel raise the limit of authority and approve cost settlements to the level it deems to be warranted by the special circumstances.

3. Where major changes are involved, even within the 2% limitation, and when such changes are warranted, the Board may approve the changes but limit the subsidy participation to the cost based on the change having been included in the original bid at time of award.

The Maritime Administration staff has been advised of these limitations. The cooperation of the Committee of American Steamship Lines in our effort to reduce changes under the contract is requested.

Export knew of the existence of this letter prior to the signing of the contracts for the construction of the ships in this case. However, the letter was neither sent to nor received by Sun and was not known to Sun.

Pursuant to the competitive bidding procedures of the Act, Sections 502 and 505, 49 Stat. 1996, 1998, as amended, 46 U.S.C. §§ 1152, 1155, Sun was found by Marad to have submitted the lowest responsible bid for the four vessels.

Pursuant to Title V of the Act the defendant United States, represented by the Federal Maritime Board, Sun and Export entered into a "Contract for the Construction of Single Crew Cargo Vessels MA Design C3–S–46b for American Export Lines, Inc.," Contract No. FMB–128 (hereinafter the Ship Construction Contract) dated January 30, 1961, for the construction of four vessels which included MA Hulls Nos. 125, 126, and 127. Further, pursuant to Title V of the Act, the defendant United States, represented by the Federal Maritime Board, and Export entered into a "Construction-Differential Subsidy Contract Between United States of America and American Export Lines, Inc.," Contract No. FMB–129 (hereinafter the Subsidy Contract) dated January 30, 1961.

Article IV of the Special Provisions of the Ship Construction Contract provides as follows:

ARTICLE IV. *Payment of Contract Price.* (a) Progress payments on account of the Contract Price set out in Article I hereof, as adjusted, shall be made to the Contractor by the Owner and the Board as the contract work progresses at monthly or at such other

intervals as the parties agree and as follows:

(i) The Board shall pay the Contractor [Sun] forty-eight per cent (48.0%) and the Owner [Export] shall pay the Contractor fifty-two per cent (52.0%) of each progress payment on account of the Contract Price * * * as such Contract Price * * * .is increased or decreased on account of changes in the contract work, approved by the Board as eligible for construction-differential subsidy.

\* \* \* \* \* \*

(iii) The Owner shall pay the Contractor one hundred per cent (100%) of that portion of each progress payment covering increases in the Contract Price set out in Article I (a) hereof on account of changes of the Owner approved by the Board as changes not eligible for construction-differential subsidy.

Article 1 of the Subsidy Contract provides as follows:

ARTICLE 1. *Grant of Construction-Differential Subsidy.*

(a) The Board grants, in compliance with the provisions of Sections 501(a) and 502 of the Act, a construction-differential subsidy to aid in the construction of the Vessels by the Owner in the total sum of the following:

\* \* \* \* \* \*

(ii) A sum which shall be equal to 48.0% of the net increase in the contract price under Contract No. FMB-128 for changes in the contract work pursuant to Article 4 of the General Provisions (exclusive of * * * changes approved by the Board as ineligible for construction-differential subsidy) approved by the Board as eligible for construction-differential subsidy; * * * provided further, however, that in the event of a net decrease in said contract price (exclusive of changes * * * approved by the Board as ineligible for construction-differential subsidy) on account

of such changes a sum equal to 48.0% of such net decrease shall be applied in the reduction of the total sum granted under this Article 1.

\* \* \* \* \* \*

(b) In no event shall the grant under this Article 1 exceed 55% of the total cost of constructing the Vessels (exclusive of the cost of * * * changes approved by the Board as changes not eligible for construction-differential subsidy), as determined by the Board.

Article 2 of such contract provides as follows:

ARTICLE 2. *Board's Payment of Construction-Differential Subsidy and the Cost of National Defense Features.* (a) The Board agrees to pay to the Shipbuilder under the provisions of Contract No. FMB-128, 48.0% of that portion of each progress payment on account of the contract price set out in Article I(a) of the Special Provisions of Contract No. FMB-128 * * *, as such contract price is increased or decreased pursuant to Article 4 of the General Provisions on account of changes in the contract work, approved by the Board as eligible for construction-differential subsidy (excluding * * * changes approved by the Board as ineligible for construction-differential subsidy).

\* \* \* \* \* \*

Article 4 of the General Provisions of the Ship Construction Contract referred to in the contract provisions quoted above is entitled and specifically intended to cover "Changes in Plans and Specifications and Adjustments of Contract Price for Changes Increasing or Decreasing Contract Work." Such Article 4 provides in part as follows:

(b) The Owner, with the approval or authorization of the Board, may direct any change in the Plans or Specifications effecting a deduction from or an addition to the contract work set out therein within the general scope thereof * * *. The Contractor shall proceed promptly with all

changes authorized or directed by the Owner, and approved or authorized by the Board, as provided in this Article 4 * * *.

* * * * * *

(d) Promptly and within a reasonable time as determined by the Board after receipt of directions from the Owner, as approved or authorized by the Board, to make a change in the Plans and Specifications, * * * the Contractor shall furnish to the Owner, in writing, a statement of its detailed estimate of the net increase or decrease in the cost of the contract work and probable delay in delivery of the Vessel to result from such change.

(e) The Owner shall transmit such statement to the Board which shall consider the Contractor's statement and on the basis thereof and on the basis of such other evidence as the Board may deem relevant shall, as soon as practicable, approve or disapprove the Contractor's estimate. The Owner shall promptly notify the Contractor of the Board's approval or disapproval of the Contractor's estimate. Notwithstanding a dispute in connection with the Contractor's estimate of the cost of a change, the Contractor shall, nevertheless, proceed promptly with the work covered by such directed or approved change. One hundred and ten percent (110%) of the net increase in estimated cost, if any, resulting from all change cost estimates, as approved or as finally determined, shall be added to Contract Price as an adjustment thereof * *.

The General Provisions of the ship construction contract contained a Disputes Clause as follows:

Article 36. DISPUTES.—Any action omission, direction, decision or determination of the Board, the Owner or the Contractor under this contract may be the subject of a dispute. Any dispute arising under this contract which is not disposed of by agreement of the parties to this contract, shall be decided by the Chief, Office of Ship Construction of the Maritime Administration, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor and to the Owner, which decision shall be final and conclusive and shall bind all parties to this contract, unless within thirty (30) days from the date of receipt of such copy the Contractor or the Owner appeals from said decision by mailing or otherwise furnishing said Chief, Office of Ship Construction, a written appeal addressed to the Board. The decision of the Board on any question of fact unless determined by a court of competent jurisdiction to have been fraudulent, capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or is not supported by substantial evidence, shall be final and conclusive and shall bind all the parties to this contract. In connection with any appeal proceeding under this Article 36, the Contractor and the Owner shall be afforded an opportunity to be heard before the Board or before the duly authorized representative or representatives of the Board appointed for the hearing of said appeal and an opportunity to offer evidence in support of or in opposition to the appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract work and in accordance with the decision of said Chief, Office of Ship Construction. The fact that the Owner, with or without comment, refers to the Board as hereinbefore provided, the Contractor's estimates as to the cost and time of making changes, shall not prejudice the rights of any party to have any dispute relating thereto decided under this Article 36.

After construction of the vessels had commenced, the traffic officials of Export reviewed the movement of refrigerated cargo on Essential Trade Route 10 (U.S. North Atlantic-Mediterranean) where the vessels were to be employed,

and in the latter part of 1962 the statistics of refrigerated cargo movement disclosed a significant increase in such movement. This increase was made known to Marad. Export determined that such trend in the movement of refrigerated cargo made it necessary as a business matter to reinclude the built-in refrigerator spaces in the vessels.

On or about December 4, 1962, in accordance with the requirements of the Ship Construction Contract, Export submitted to Marad Owner's Change Request No. 64 requesting that refrigerator cargo space be included in each of the four vessels.

By telegram dated January 28, 1963, from Mr. L. C. Hoffmann, Marad's Chief of the Office of Ship Construction, to Export's Naval Architect with a copy to Sun, Marad approved the changes in the contract work on three of the four vessels and stated that the cost of the changes eligible for subsidy participation "will be based on what Board determines amount would have been had work been included in bidding plans and specifications." The full text of the telegram is as follows:

Maritime Administration
Washington 25, D. C.

January 28, 1963

American Export Lines, Inc.
C/o J. J. Henry Company, Inc.
21 West Street
New York, New York

ReUrLet 12–4–62 C4–S–46b Change Request 64. Provision of built-in reefer cargo space in No. 6 upper and lower 'tween decks, on MA hulls 125–127 only, approved for authorization. Subsidy participation in cost of change will be based on what Board determines amount would have been had work been included in bidding plans and specifications. Staff estimates this amount would have been approximately $50,000 per ship less than contractor's estimate. Preliminary increased cost estimate of $260,000 for MA hull 125 and $250,-000 per ship for MA hulls 126–127 noted. MA change No. 41 assigned. Final estimates subject to adjudication. Extension of delivery dates approximately one month each ship, with delivery dates still within contract delivery dates, noted. Your attention invited to provisions of section 7 Department Commerce order No. 117 (revised) of April 9, 1962.

/s/ L. C. Hoffmann
L. C. HOFFMANN
Chief, Office of Ship
Construction

Export's Naval Architect, J. J. Henry Company, Inc., notified Marad by letter dated January 29, 1963, that Export would proceed with the installation of the refrigerated space in Hulls Nos. 125, 126 and 127. Such letter also stated that Export "will shortly send you their comments on the question of reefer space on Hull No. 623 (S.S. Export Courier) and the Board's change approval action basing subsidy participation on what the cost might have been had the work been included in bidding plans and specifications."

Export wrote a letter to Marad dated February 26, 1963, saying in part:

* * * * * *

A review of the pertinent documents discloses no provision whereby subsidy

participation in the cost of an approved contract change shall be based upon other than the net increase or decrease in the cost of the actual work to be accomplished. We therefore wish to appeal that portion of your determination which apparently seeks to limit subsidy to the conjectural amount of what the work would have cost if it had been included in the initial bidding specifications.

\* \* \* \* \* \*

Sun's prelminary estimate of the cost of performing the changes on the three vessels on which the changes were performed was approximately $760,000. By a letter dated July 24, 1963, Sun submitted, as required by Article 4(d) of the General Provisions of the Ship Construction Contract, its final detailed estimate which totaled approximately $1,-105,000. Marad's staff undertook to adjudicate and renegotiated Sun's final determination of estimated cost in accordance with standard procedure under such contracts and such costs were reduced to $1,025,000 which Marad considered to be "the fair and reasonable value for the accomplishment of this change." Export paid to Sun 52 per cent of such final adjudicated cost (plus 10% profit) in the amount of $586,300.

By a letter dated December 20, 1963, Marad advised Export that Marad considered that the cost of the changes had they been included in the original bidding plans and specifications would have been $660,000 and that, therefore, that was the total amount eligible for subsidy participation.

In connection with Export's appeal, an evidentiary hearing was held before a representative of the Maritime Administration in proceedings entitled American Export Isbrandtsen Lines, Inc., Shipbuilding Contract Appeal (MSB Docket CA–4) 1 MA 609, 5 SRR 343, 345 (1964). Such representative on September 21, 1964, upheld the determination of the Maritime Subsidy Board limiting participation in the cost of the approved changes to the amount the work would have cost had the work been included in the original bidding specifications, but recommended that the $660,000 "as if" figure be adjusted upward to $675,000. On December 7, 1964, the Maritime Subsidy Board affirmed its own previous actions and the decision of its representative. In accordance with Section 7 of the Department of Commerce Order 117 (Revised) Export petitioned the Secretary of Commerce to review and reverse such decision of the Maritime Subsidy Board. The petition was denied without opinion by order of January 15, 1965.

The final "adjudicated" cost of performing the changes in the vessels was $1,025,000. One hundred ten percent of such final "adjudicated" cost, which under Article 4(e) of the General Provisions of the Ship Construction Contract, was to be added to the Contract Price, was $1,127,500. Export paid to Sun 52 percent of such amount or $586,300. Forty-eight percent of such amount is $541,200. The defendant United States has paid to Sun 48 percent of $675,000, which is the amount determined by Marad to have been what the cost of the changes would have been had the work been included in the original bidding specifications, or $324,000. The difference between such $541,200 and such $324,000 or $217,200 is the amount claimed by Sun from the defendant United States as damages, plus interest thereon.

Sun has sued defendant for damages based on its claim that defendant breached the three-party Ship Construction Contract by refusing to pay it 48 percent of all of the cost of adding the refrigerator space to the three ships. Export takes the same position and asks the court to enter judgment for Sun against defendant for the $217,200 that Sun demands. The defendant denies liability and denies that it has breached the Ship Construction Contract, and says that it has paid Sun in full all authorized subsidy, and that Export is required to pay Sun all unpaid construction costs of the changes in the ships. Accordingly, defendant says that if Sun re-

covers any judgment against it, defendant should recover judgment for the same amount over against Export.

The legal relationship, issues, and defenses existing between Sun and the defendant are different from those existing between Export and the defendant. Consequently, we will discuss them separately. Sun's claim will be considered first:

## I

### Claim of Sun Shipbuilding and Dry Dock Company

Sun bases its claim on a breach of contract which it alleges against the defendant. It contends that Article IV (a) (i) of the Special Provisions of the Ship Construction Contract, supra, unequivocally requires Marad to pay 48 percent (and Export to pay 52 percent) of each progress payment on account of the contract price as such contract price is increased or decreased on account of changes in the contract work approved by the Board (Marad) as eligible for construction subsidy. It says that this contract provision is clear and unambiguous, and that a reasonable interpretation of it gives it the meaning that once Marad approved a change in work, it was required to pay 48 percent of *all* of the cost of the change in work, or pay none of it. Sun further contends, on the other hand, that Marad could not pay *less* than 48 percent of the total cost of the change in work once the change in work had been approved by Marad unless it refused to pay any of it. Without more, the contract could be read as reasonably sustaining Sun's interpretation of it as stated above.

However, defendant takes a different view of the contract. It says that Article IV(a) (i) of the Special Provisions of the contract does not mean that when Marad approved a change in work it automatically had to pay 48 percent of *all* of the increase in cost of the work or none of it. On the contrary, the contract vested in it the discretion of determining *how much*, if any, of the increased cost of the work would be

eligible for the 48 percent subsidy. It points to the words, " * * * as such contract price is increased * * * on account of changes in the contract work, approved by the Board as *eligible* for * * * subsidy" in such paragraph in support of its position. (Emphasis supplied.) It also cites Article IV(a) (iii) of the Special Provisions of the contract, supra, to support its interpretation of the contract. That paragraph of the contract requires the Owner (Export) to pay Sun 100 percent of *that portion* of each progress payment covering increases in the contract price on account of changes performed by Sun approved by the Board as changes *not eligible* for subsidy. Defendant says that these provisions of the contract gave Marad the right and the discretion to authorize or approve changes in the contract work and at the same time determine what portion, if any, of the increase in the cost of the changes in work was eligible for the 48 percent subsidy. It denies that the contract requires it to automatically pay 48 percent of the total increase in price of changes in work it has approved or none of it, but claims that it has the right to determine how much, if any, of the increase in price is eligible for the full 48 percent subsidy. The telegram, supra, which it sent to Export, with a copy to Sun, on January 28, 1963, approving the changes in work on three ships but limiting the subsidy participation to what the changed work would have cost had the work been included in the plans and specifications, was sent in accordance with Marad's view of the contract and pursuant to its provisions, argues the defendant.

It appears that the contract could be read so as to reasonably sustain defendant's interpretation of it, just as it could be read so as to reasonably sustain Sun's construction of it as was pointed out above. It appears then, that we have two reasonable constructions of the contract that lead to different results. It is obvious that under these circumstances, the contract is ambiguous, because it is susceptible of two different

interpretations, each of which is found to be consistent with the contract's language. Bennett v. United States, 371 F.2d 859, 861, 178 Ct.Cl. 61, 64 (1967).

It is the rule that where we have a contract that has been written by the government which is ambiguous, ·the ambiguity will be resolved against the drafter of the document (the government) and in favor of the other party. *Ibid.*

Accordingly, we hold that Sun's construction of the ambiguous contract, being reasonable, must prevail as against the defendant. According to this view, when Marad approved the change in work, it became bound to pay 48 percent of the total increase in the cost of the work resulting from the change.

The defendant contends that its telegram was a counter offer to the request of Export for the change in work and when Export went ahead with the work because of the telegram, it accepted Marad's counter offer and the contract was amended accordingly. We do not agree. The change in work was authorized by the contract and arose under it and no amendment to the contract was necessary for the work to be authorized. Furthermore, Sun was a party to the contract, but never agreed that it would be amended. Consequently, any alleged amendment made by Export and Marad would not be binding on Sun.

In the beginning, the defendant alleged in its answer that Sun was estopped to deny Marad's authority to base subsidy participation on what the cost of the changes would have been if they had been in the plans and specifications, because Sun had accepted as full and final payment Marad's ·share of the various progress payments as consideration for doing the work. However, this point appears to have been abandoned by defendant, as it has not been briefed. Therefore, we are not called upon to consider it.

Also, defendant alleged in its pleadings that Export had appealed administratively from Marad's decision to the Maritime Subsidy Board and to the Secretary of Commerce under the Disputes Clause· of the contract, and Marad's decision was upheld at all levels. Defendant alleged that this was final and binding on all parties. Sun did not appeal administratively. We are not called upon to decide the question of the finality of the administrative decision inasmuch as defendant has abandoned its contention with reference to it. Sun has contended throughout that its claim is for breach of contract and involves only questions of law.

Accordingly, Sun is entitled to recover its damages in the sum of $217,200 from the defendant.

## II

### *Claims of American Export Isbrandtsen Lines, Inc., and the United States*

When this suit was filed by Sun against defendant, Export was made a third-party defendant by the government. Thereafter, Export intervened and now asks that judgment be entered for Sun against the government. The defendant (government) asks for judgment over against Export for any recovery against defendant by Sun.

The controversy between Export and the United States is entirely different from that between Sun and the government, although all disputes grew out of the same transaction. But here we have another contract (The Subsidy Contract), supra, and the policy guidance letter of November 3, 1960, supra, to be considered, in addition to the Ship Construction Contract and the telegram considered above with reference to Sun's claim.

Defendant says that Export should have to pay the $217,200 balance due Sun for installing the refrigerators in the three ships. It says this is true for several reasons. It contends, as it did against Sun, that under the provisions of Article IV(a) (i) of the Special Provisions of the Ship Construction Contract it was only required to pay 48 percent of the increase in the contract price which it found to be eligible for subsidy

due to changes it had approved in the contract work requested by the Owner (Export). Defendant urges that Article IV(a) (iii) of the Special Provisions of the Ship Construction Contract makes the ship owner (Export) liable for 100 percent of all increases in the contract price approved by Marad as *not eligible* for subsidy due to changes in work approved by Marad.

As further support for its position, defendant refers to Article 1.(a) (ii) of the Subsidy Contract, supra, between Export and Marad, which provides that Marad grants subsidy to Export of 48 percent of the increase in contract price for changes in contract work (*exclusive of changes approved by the Board as ineligible for subsidy*) approved by the Board as *eligible* for subsidy.

Defendant also cites Article 2.(a) of the Subsidy Contract, supra, wherein Marad agreed to pay Sun 48 percent of *that portion* of each progress payment on the contract price as it is increased on account of changes in contract work, approved by Marad *as eligible* for subsidy, (*excluding* changes approved by Marad *as ineligible* for subsidy).

Defendant says that these provisions in both contracts gave Marad the authority to do the following regarding changes in the work and subsidy participation with reference thereto:

1. Marad could disapprove a requested change in work, in which case the work could not be done.

2. Marad could approve a requested change in work and pay 48 percent of the total increase in price.

3. Marad could approve a requested change in work and pay none of the increase in price, in which case the work could be done but Export must pay 100 percent of the increase in price.

4. Marad could approve the requested change in work but pay only 48 percent of the price it would have cost if the work had been included in the plans and specifications at the time of the award.

Export agrees to the first three of the foregoing propositions, but says the contracts do not authorize the fourth. It takes the same position that Sun took with reference to its claim. That is, it says that the contracts must be interpreted to mean that once Marad approved a change in work, it had to automatically pay 48 percent of the increase in the contract price, or pay none of it. It argues that Marad must pay all (48 percent) or nothing, and that the contracts did not allow it to pay subsidy on a part of the increased price. We held that this interpretation of the contract was reasonable as to Sun, but we are required to take a different view with respect to Export. This is partly because the subsidy contract between Export and Marad, to which Sun was not a party, indicates that Marad was given the authority by the contract to determine that certain increases in the contract price were eligible for subsidy and that others were ineligible. This extended to price as well as to work. If this were not so, the provisions in Articles 1 and 2 of the subsidy contract, supra, excluding changes approved by Marad as ineligible for subsidy would be meaningless. See AMP Incorporated v. United States, Ct. Cl. 389 F.2d 448, decided January 19, 1968.

If this is not enough, the question is laid to rest by the policy guidance letter, supra, that was sent to Export, among others, by Marad on November 3, 1960, before the instant contracts were executed. That letter specifically stated " * * * in order to establish Federal Maritime Board *policy guidance* to the Owner [Export here], the Board has agreed in the following: * * * *the Board may approve the changes but limit the subsidy participation to the cost based on the change having been included in the original bid at the time of award.*" (Emphasis supplied.)

When the contracts were executed, Export was familiar with this policy guidance letter and knew the meaning that Marad gave to the various Articles of the contracts. Export knew full well the

meaning that Marad intended to convey in the cited Articles of the contract, because the policy guidance letter had fully informed Export. Consequently, when Export received the telegram from Marad of January 28, 1963, supra, stating that subsidy participation in cost of change will be based on amount it would have been had work been included in bidding plans and specifications, it knew that Marad was acting in accordance with the contracts and that the contracts authorized Marad to take the action set forth in the telegram.

This court stated in Cresswell v. United States, 173 F.Supp. 805, 811, 146 Ct.Cl. 119, 127 (1959):

> If one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning. The same is true if he had reason to know what the other party intended. (Cases omitted.) (Emphasis supplied.)

See also The Franklin Co. v. United States, 381 F.2d 416, 180 Ct.Cl. 666 (1967); City of Memphis, Tenn., v. Ford Motor Co., 304 F.2d 845, 849 (6th Cir. 1962).

In our opinion, Export knew the meaning Marad intended to convey by the provisions of the contracts at the time they were executed and was bound by that meaning. At least it had reason to know what Marad intended.

Under these circumstances, Export's interpretation of the meaning of the contracts in question is not reasonable, even though the contracts could be said to be ambiguous. Since they are ambiguous, we can look to the policy guidance letter to determine their meaning. When this is done, the interpretation of Export becomes unreasonable and that of defendant reasonable.

When Export received Marad's telegram it knew that Marad was liable under the contracts only for 48 percent of what the change in work would have cost if it had been included in the plans and specifications, and that Export would have to pay the balance. It chose to go ahead and have the work done on this basis and is responsible for the difference.

On the other hand, Marad's interpretation of the contracts under all the facts and circumstances, is reasonable, and it should not be required to pay more than 48 percent of what the increase in price of the work would have been if the work had been included in the plans and specifications. It was correct in its interpretation of the contracts as imposing liability upon it for only 48 percent of the increased contract price which it approved *to the extent* or *insofar as eligible* for construction-differential subsidy because of the change in work.

Even if it could be said that Export was uncertain as to the construction Marad placed on the contracts before they were executed, it was put on inquiry by the policy guidance letter, issued only a short time previously. It was blind indeed, and unreasonable, to proceed to make the changes in work after receiving the telegram from Marad, without asking any questions. It must be assumed that it knew and acquiesced in the proposition that it would be required to pay all of the increase in the contract price over and above the amount stated in Marad's telegram to be eligible for subsidy.

It should be pointed out that our view of this part of the case is actually favorable to shipowners. For instance, if a shipowner negligently omits certain features from his plans and specifications and discovers the error after the construction-subsidy contracts have been executed, he would no doubt be willing to pay a part of the costs when he later requests a change. According to the argument of Export here he would be entitled to a subsidy on all of the change or on none of it.

In this case, if Marad can approve the change and pay nothing, or approve the change and pay subsidy on all of it, why is it not possible for it to approve the change and pay subsidy on the part it deems eligible for the 48 percent subsidy? This would seem to be fair to all

concerned and certainly in accord with the policy letter and the contracts.

Defendant pleaded that Export appealed administratively and received an adverse decision that is binding on it. Export, in its pleading, challenged the administrative finality. However, both parties have abandoned their theories and we are not called upon to decide them. The controversy arose under the contract and was one in which the Appeal Board could have given complete relief. In fact, the administrative decision raised the amount eligible for subsidy from $660,-000 to $675,000 and Export paid Sun 52 percent of this amount.

It should be pointed out that Export has not attacked the determination by Marad that $675,000 was the amount eligible for subsidy, nor has it shown any reason why it would be inequitable for it to pay the remainder of the increase in cost not paid by Marad. We must conclude that the determination of the cost of the work by Marad, if it had been included in the plans and specifications, was proper and that there was no abuse of discretion by Marad.

■ It is our opinion that Export should be required to pay the difference in the increase of costs due to the change in the work which has not been paid by Marad.

■ This leaves only the question of allowing a recovery in favor of the defendant over against Export. We do not have to consider the legal complexities involved when third parties are impleaded by the government or comment on our recent opinion in Christy Corp. v. United States, Ct.Cl., 387 F.2d 395, decided December 15, 1967. Export by its motion to intervene has voluntarily requested affirmative relief and a decision on the merits. In these circumstances, it has become a party-plaintiff and we are permitted to render judgment upon "any * * * demand by the United States against any plaintiff * * *." 28 U.S.C. § 1503 (1964). Accordingly, we may enter judgment in favor of the defendant on what is in effect, its contingent counterclaim.

In conclusion, plaintiff's motion for summary judgment is granted and judgment is entered in favor of Sun in the amount of $217,200 against defendant; defendant's motion for summary judgment is granted in that judgment is entered in favor of defendant against the Third-Party Intervenor, Export, for the sum of $217,200; and, the motion for summary judgment of the Third-Party Intervenor, Export, is denied.

COWEN, Chief Judge, concurs in the result.