**SUN SHIPBUILDING & DRY DOCK COMPANY**

v.

**The UNITED STATES.**

**No. 756-71.**

United States Court of Claims.

June 16, 1972.

John J. Runzer, Philadelphia, Pa., attorney of record, for plaintiff; E. Parry Warner and Pepper, Hamilton & Scheetz, Philadelphia, Pa., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was L. Patrick Gray, III, Asst. Atty. Gen., for defendant.

Michael Joseph, Washington, D. C., attorney of record, for third-party Prudential Grace Lines, Inc.; Kominers, Fort, Schlefer & Boyer, J. Alton Boyer, and Marcus B. Slater, Jr., Washington, D. C., of counsel.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT DISMISSING THE PETITION OR IN THE ALTERNATIVE FOR AN ORDER SUSPENDING PROCEEDINGS PENDING EXHAUSTION OF ADMINISTRATIVE PROCEEDINGS, AND ON THIRD-PARTY DEFENDANT'S MOTION TO VACATE AND QUASH SERVICE OF THIRD-PARTY NOTICE

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

DAVIS, Judge:

Under the tripartite scheme well known to the American maritime world, plaintiff Sun Shipbuilding & Dry Dock Company agreed to construct four general cargo ships for shipowner Grace Lines, Inc. (now Prudential Grace Lines, Inc.), with the United States as grantor

of a construction-differential subsidy.[1] An amendment increased the number of vessels to six and the contract price to $77,850,000.[2] This case does not concern the determination of the amount of the subsidy but solely the shipbuilder's demand for an increased price under the "changes" mechanism in the contract. Sun's contention is that the Maritime Administration has dawdled too long in processing and deciding the claim, and that this court should take over the whole matter at once, as in New York Shipbuilding Corp. v. United States, 385 F.2d 427, 180 Ct.Cl. 446 (1967).

During the course of performance, numerous changes were ordered by Grace and approved for subsidy by the Maritime Subsidy Board, the most important of which called for an increase in mechanization and a reduction in quarters for crew. Sun made these changes, and in December 1967, three months after delivery of the last vessel, submitted, pursuant to Article 4(d) of the contract,[3] estimates of the increase in costs and the delay in delivery-time said to be necessitated by the alterations. This estimate included not only the cost of additional "hardware" but also the expense of delay. The statement likewise sought an extension of time in order to relieve Sun of liability for liquidated damages (alleging that the changes ordered by Grace had occasioned the late delivery).[4]

Sun's claims were referred to the Division of Estimates, a staff section of the Office of Ship Construction of the Maritime Administration. The Division of Estimates considered the request for an extension in delivery-time separately from the demand for an increase in price and, after receipt of comments by Grace, rendered a decision on April 7, 1969, only on the time-extension claim. On July 3, 1969, this time-extension determination by the Division of Estimates was challenged by Sun under Article 36 (the disputes clause),[5] and the issue was then formally referred under that provision to the Chief, Office of Ship Construction (COSC) for resolution.

The COSC announced his decision on December 21, 1970 and Sun appealed to the board on January 18, 1971. Pursuant to usual practice the matter was referred by the Board to a hearing examiner, as its arm, prior to final action by the tribunal itself. The examiner held a pre-hearing conference on March 30, 1971, and scheduled the hearing for early August. At the request of Grace, that initial date was postponed to permit further time for discovery, and the hearing was rescheduled for December 6, 1971.

1. For descriptions of these tripartite subsidy arrangements, see Sun Shipbuilding & Dry Dock Co. v. United States, 393 F.2d 807, 183 Ct.Cl. 358 (1968); Moore-McCormack Lines, Inc. v. United States, 413 F.2d 568, 188 Ct.Cl. 644 (1969); Lykes-Youngstown Corp. v. United States, 420 F.2d 735, 190 Ct.Cl. 348, cert. denied, 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970).

2. The percentage of payment was divided differently between the Maritime Subsidy Board and Grace in the original contract and the addendum, but in each instance Grace paid slightly less than half, 46% for the first four ships and 47.5% for the remaining two.

3. Article 4 is set forth in full in the Appendix, infra. See also note 6, infra.

4. This latter request would come under Article 5, "Extension of Time."

5. Article 36 (which differs from the conventional form of disputes provision) reads in part: "Any action, omission, direction, decision or determination of the Board, the Owner, or the Contractor under this contract may be the subject of a dispute. Any dispute arising under this contract which is not disposed of by agreement of the parties to this contract, shall be decided by the Chief, Office of Ship Contruction * * * which decision shall be final and conclusive and shall bind all parties to this contract unless within thirty (30) days * * * the contractor or the Owner [Grace] appeals from said decision by mailing * * * a written appeal addressed to the Board."

The full text of Article 36 is set forth in the Appendix, infra.

Sun filed suit in this court on October 6, 1971, asserting that the Maritime Administration had delayed too long and that the cost issues should all be settled here. The December hearing was stayed pending our determination whether to take the case on its merits.

The gravamen of the court suit is that, with a delay of four years (1967–71) in resolving the controversy, the Board has breached its contractual duty to act "as soon as practicable" (Article 4(e)) [6] and that the remedy provided in the disputes clause (Article 36) has been shown to be inadequate and unavailable. Insisting that the same questions of fact and law upon which the United States' liability depends also control Grace's liability, Sun has served a third-party notice on the latter pursuant to our Rule 41(a). The Government naturally asserts that Sun should pursue its contractual remedy to exhaustion, and moves for summary judgment dismissing the petition on that ground, or, alternately, for suspension of proceedings in this court pending completion of the administrative process. Grace, the third-party, joins in that prayer but also seeks, in any event, to vacate and quash service of Sun's third-party notice. The case is now before us on those two motions.

## I.

One of Sun's prime points is that this case parallels New York Shipbuilding Corp. v. United States, 385 F.2d 427, 180 Ct.Cl. 446 (1967), in that (it is said) the entire disputes mechanism was aborted because the Maritime Administration did not follow the contractually-designated procedure.

In *New York Shipbuilding*, arising out of the construction of the USS Savannah (the first nuclear-powered merchant ship), the court held that the parties had bargained for decisions of contractual disputes, not by the customary contracting officer, but by a specific official who would have the requisite detailed expertise to handle such conflicts—the Nuclear Projects Officer. When the final decision was not rendered by this individual but by another high official with broader responsibility and less extensive concern with nuclear vessels, we viewed the decision by the improper authority as a nullity, and stated: "We can act therefore as if, prior to bringing suit here, plaintiff received no determination at all of its claims under the contract." *Id.* 385 F.2d at 436, 180 Ct.Cl. at 461–462.

It was in those circumstances of the utter lack of a proper initial determination that we concluded: "[T]he defendant's delay was so long and so unjustified that the Government must be held to have breached its implied contract to render a timely and appropriate decision." (*Id.* 385 F.2d at 436, 180 Ct.Cl. at 462). In *New York Shipbuilding*, as in this case and in the usual disputes clause controversy, there was a two-step administrative procedure once the formal disputes process had been invoked—first a determination by the contracting officer (or a substitute) and then an appeal to a contract appeals board. We emphasized in the earlier case that there had been no lawful preliminary decision, no necessary first step: "No proper initial decision has been rendered administratively, there is nothing from which to appeal, and there is nothing for the appeal board to consider."

The reason plaintiff gives for pushing this case into the *New York Shipbuilding* mold is that the Maritime Administration failed to comply with the requirement of Article 4(e), note 6, *supra*, that "the *Board* * * * shall consider the Contractor's [Sun's] statement [of esti-

6. Article 4(e), Appendix, *infra*, reads in part: "The Owner [Grace] shall transmit such statement [cost estimate] to the Board which shall consider the Contractor's [Sun's] statement and on the basis thereof and on the basis of such other evidence as the Board may deem relevant shall, as soon as practicable, approve or disapprove the Contractor's estimate. The Owner shall promptly notify the Contractor of the Board's approval or disapproval of the Contractor's estimate."

mated costs for the changes] and on the basis thereof and on the basis of such other evidence as the *Board* may deem relevant shall, *as soon as practicable,* approve or disapprove the Contractor's estimate" (emphasis added). The argument is that this portion of the agreement compelled the Maritime Subsidy Board itself—not the Division of Estimates, or the Chief, Office of Ship Construction (COSC)—to make the first approval or disapproval of the shipbuilder's cost estimate. We are cited to the Board's Administrative Order 12,[7] to the effect that the Board has delegated authority to the COSC to approve changes in cost, as well as delay in delivery, only where the amount is not in excess of $50,-000, a far smaller claim than is involved here.

But plaintiff, as we see it, misinterprets the structure of this special disputes' mechanism, especially in the light of the maritime agency's consistent understanding of that design. Article 4(d), Appendix, *infra,* calls upon the shipbuilder, once an owner's change has been authorized, to furnish a cost estimate (a "detailed estimate of the net increase or decrease in the cost of the contract work"), as well as an estimate of probable delay. Under the first sentence of Article 4(e), the Government is to decide whether to approve or disapprove this estimate. This is a first stage, coming before the invocation of the disputes procedure, and comparable to the ordinary effort by a contractor to obtain the contracting officer's consent to a specified equitable adjustment. No contractual dispute arises in the technical sense unless and until the Government (or the owner) does formally and finally disapprove and disagree.

In other words, Article 4(e) contemplates either of two possibilities as occurring after the shipbuilder submits its estimate: first, all parties may agree (the Board manifesting its agreement by approval), resulting in adjustment of the contract price to reflect 110% of the Contractor's estimated cost as approved by the Board; or, second, the owner (Grace) and the Government may disagree with the estimate, leading to a formal dispute to be settled through the procedure of Article 36, Appendix, *infra.*[8] In the latter event, the first-level decision (akin to the final decision by the contracting officer in the standard disputes situation) is by the COSC. If the contractor (or the owner) is dissatisfied with that finding, it may then appeal to the board itself.

Under this system we see no reason why the Board may not remit to the Division of Estimates the preliminary scanning of the shipbuilder's estimate. If the Division had agreed with that proposal, then the Board would itself have to give approval, perhaps through some informal procedure,[9] since Order No. 12, *supra,* delegates final power *to approve* only if the amount is no more than $50,-000. But where the Division disagrees, the ensuing procedure differs; in that event the Board's determination is to be obtained through the steps of the formal disputes mechanism.

 Nothing prohibits the adoption of such a course. The contract, reasonably read, permits it. Order No. 12 does not deal with a tentative *disapproval* (by a lower level of the agency) of a large change, or forbid consideration of such an estimate by staff (including the Office of Ship Construction and its components); only definitive approval at

---

7. Administrative Order 12, Pike & Fischer, Shipping Regulation 110: 168–176, § 2.02(1) and (2).

8. Article 36, Appendix, *infra,* provides (in part): " * * * Any dispute arising under this contract which is not disposed of by agreement of the parties to this contract, shall be decided by the Chief, Office of Ship Construction * * *

which decision shall be final and conclusive and shall bind all parties to this contract unless within thirty (30) days * * * the Contractor or the Owner appeals from said decision by * * * a written appeal addressed to the Board * * *"

9. This assumes that the owner also agrees to the estimate.

the lower level is excluded by the order. Nor are we pointed to anything else barring delegation by the Board of the initial review of the shipbuilder's estimate. Accordingly, it is a permissible reading of the first sentence of Article 4(e) to say that the Board itself need not pass upon the estimate before the disputes mechanism can be triggered (an event which occurs, of course, only if the Government (or the owner) disagrees), but that the Division of Estimates can make the first survey.

Indeed, it would be most awkward to interpret Article 4(e) as compelling a negative determination by the Board itself before a dispute can arise. For if the Board disapproved the estimate at that first stage, the contractor would have the right to invoke the disputes procedure of Article 36, leading to an initial formal decision by the COSC, a subordinate of the Board which had just indicated disapproval, and then to an appeal to the very Board which had already given an unfavorable response. In view of those consequences of plaintiff's reading, the Government cannot be chided for giving, as it has, the other construction to Article 4(e).

Plaintiff was obviously aware of this agency procedure and in fact followed it. After the Division of Estimates acted less favorably than Sun desired, the latter placed the matter formally in dispute (on July 3, 1969) under Article 36 and awaited the formal determination of the COSC.[10] There was no protest at that time that the Board itself should have acted before the matter could be placed in dispute. Then, after the COSC decided, Sun took its appeal to the Board, again without such a protest. Until litigation was begun in this court, there is no record (of which we are aware) that Sun contended that the agency was acting invalidly in failing to have the Board itself pass at the outset on the cost estimate. Moreover, the procedure of initial formal decision by the COSC followed by an appeal to the Board appears to have been utilized in at least five previous cases in which Sun was the aggrieved contractor.[11]

The result is that this case is not at all like *New York Shipbuilding* in which the fatal defect was the absence of any proper initial determination from which an appeal could be taken. Here, in contrast, there was a first partial determination by the proper official, and an appeal to the appeals board was taken. The COSC's decision on the dispute possessed the same degree of initial finality under the Grace-Sun-Maritime contract as the Nuclear Project Officer's decision (had it been forthcoming) under the *New York Shipbuilding* contract. Both officials stood in the shoes of the contracting officer who customarily decides disputes, in the first instance, under Government contracts. The difference is that in *New York Shipbuilding* the designated Nuclear Project Officer had never acted while in the present instance the COSC acted on part of the claim well before this suit was brought, and was properly seized of the other aspects.[12]

---

10. The regulations list as duties of the COSC that his office "[a]pprove or recommend approval of changes above $10,000" and "[u]nder the Disputes article in Ship Construction Contracts decide disputes arising out of such contracts." Pike & Fischer, Shipping Regulations 110: 168–176, § 3.01(4) and (5).

11. Reported at 7 SRR 944 (1966); 7 SRR 997 (1967); 7 SRR 1100 (1967); 9 SRR 503 (1967); 9 SRR 799 (1967).

12. The COSC did not act, before the petition was filed, on the cost phase of Sun's claim, but the record is clear that he had it before him and intended to act upon it in what he deemed due course. See Part II, *infra*. He never disavowed either his power to act on that facet of the claim or his intention to do so, and there was no reason to believe that he had any other position. If Sun thought that he had decided never to act upon the cost aspect, it could have made that "decision" the subject of a formal dispute under the first sentence of Article 36, the disputes clause: "Any action, *omission*, direction, decision or determination of the Board, the Owner or the Contractor under this contract may be the subject of a dispute" (emphasis added).

The departure from the required procedure which Sun asserts did not actually exist.

## II.

Plaintiff's other major contention is that, even if the proper officials were involved at all levels, still the Maritime Administration dallied too long in considering the claim—so long that under the rule of Universal Ecsco Corp. v. United States, 385 F.2d 421, 424–426, 181 Ct. Cl. 10, 16–19 (1967), and similar decisions, the Government "must be held to have breached its covenant to render a timely decision, with the consequence that plaintiff became immediately entitled to a court adjudication." Clement Bros. Co. v. United States, 418 F.2d 1356, 1358, 190 Ct.Cl. 50, 53 (1969).

■ There is, of course, no rule of thumb for appraising delays in the contractual-administrative process. Like all tribunals, the procuring agency has considerable discretion and leeway in controlling its procedure, and must have due time to decide fairly. On the other hand, it cannot abuse its discretion by dragging its feet so leadenly that the delay becomes intolerable. The overall standard for evaluating the propriety of a delay looks to the particular case and the particular situation: the agency "cannot wait indefinitely before making a decision, but must act within a reasonable time under the existing facts and circumstances." Universal Ecsco Corp. v. United States, *supra*, 385 F.2d at 425, 181 Ct.Cl. at 18.

A. In this instance it is clear that a long time did elapse, begun by the decision of the Division of Estimates to consider Sun's request for a time-extension separately from the claim for a price-increase (although both were presented simultaneously). Because of that choice, the Division of Estimates gave its position on the time-extension in April 1969 —and only on that one issue at that time. After that limited question was put into dispute the COSC decided it in December 1970, and appeal to the Board was taken in January 1971.

The Government explains deferral of the cost claim as a deliberate election to await the outcome of another proceeding then before the Maritime Administration, Sun Shipbuilding & Drydock Co. v. United States Lines, in which the controversy arose out of another tripartite contract—between United States Lines, Sun, and the Board—involving the same question of costs and delay in installing mechanization equipment and revamping the crew's quarters pursuant to change orders, and embodying the identical disputes clause. The Sun-United States Lines case was decided by the Board on August 25, 1971.[13] The Division of Estimates was then directed to proceed forthwith on its evaluation of Sun's cost estimates in the current Sun-Grace case, in the light of the Board's *United States Lines* ruling. The COSC handed down his determination of costs in January 1972, after suit was commenced here (on October 6, 1971).

■ To evaluate Sun's position that the postponement of consideration of the cost claim until the Board acted in *United States Lines* was unreasonable, we must look to the relationship of the United States Lines-Sun case to the present Grace-Sun claim. Early in 1967, the Division of Estimates acted upon Sun's claim in *United States Lines*. Since a lesser amount was allowed than had been hoped, Sun placed the matter in dispute, thereby triggering a formal decision by the COSC which came late in 1969. Unhappy with his determination, the parties in *United States Lines* appealed to the Board. Meanwhile, as of June 1, 1970, the COSC communicated to Sun his then-prevailing intention to decide both the cost and time-extension claims together in the Grace-Sun case.

In the following weeks, two events occurred which seem to have changed his mind. First, in June 1970, the Board's hearing examiner in *United States Lines*

---

13. The Board's hearing examiner had given his recommended decision on June 6, 1970, and oral argument was heard on March 17, 1971.

recommended (see note 13, *supra*) a significant increase in that award to Sun. His was the first reported decision within the agency (1) approving the "daily rate" method of computing the cost of unabsorbed overhead; and (2) dealing with the issue of whether delay-associated costs were recoverable under the Board's standard-form construction contract or whether the "Rice Doctrine" (named after United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942)) was applicable. The second and related development was the significant upward revision of Sun's estimate in this Grace-Sun proceeding from $12,996,259 to $17,899,313, submitted to the Board on July 27, 1970. Sun's letter setting forth this $5,000,000 increase explained that "recent recommendations by the Hearing Examiner in the delays of five *U.S. Lines* ships * * * have introduced certain methods of assessment of delay costs previously unconsidered."

It appears, then, that in large measure Sun occasioned the postponement of the evaluation of its cost estimate in the Grace-Sun proceeding until the Board's decision in the United States Lines-Sun contract claim, or, at least, that it acquiesced in such a delay. From the outset, Sun's tripartite contracts with United States Lines and with Grace were similar; in addition, comparable mechanization changes and the ensuing questions of cost and delay were raised in each case. From the time of Sun's upward revision of its cost estimates on the present contract in July 1970, the resemblance became even more striking, since Sun itself introduced into this proceeding the new method of estimating delay costs approved by the examiner in *United States Lines*, and soon to be reviewed by the Board.

Had the extensive increase in the estimate been unconnected with the *United States Lines* litigation, delay in processing would still be the likely result of such a major new submission, but deferral became almost inevitable in view of the admitted origin of the new estimate in the recommended decision of the hearing examiner in *United States Lines*. At the least, it was certainly reasonable, in those circumstances, for the agency to wait for the Board's action in *United States Lines* —even though it might also have been a reasonable course to choose to go ahead simultaneously in its Grace-Sun proceeding. Tribunals often defer action until another controversy raising the same questions has been resolved, either by the tribunal itself or by another.

Sun attacks the sincerity of the Government's explanation for the delay (that Maritime was waiting for the Board's *United States Lines* ruling) on the ground that when the COSC finally issued his decision on costs in January 1972 he did not (according to plaintiff) pay much attention to the Board's *United States Lines* determination. We do not scan the January 1972 decision to see the extent to which it may have followed or deviated from the Board's earlier ruling —that is surely not a question now before us at the current stage of this case. Suffice it that nothing on the face of the COSC's decision shows bad faith or any reason to reject the suggestion in that opinion that the COSC postponed his determination until the Board had acted in *United States Lines*. Nor is there any extrinsic proof of bad faith.

The reasonableness and good faith of the postponement must be evaluated as of the time it was undertaken. At that moment the COSC could not have foreseen exactly what the Board would conclude, and if the Board's opinion turned out to be less helpful than he had hoped he would not be the first official or tribunal to defer action until another body has ruled, only to find that the subsequent determination did not shed as much light as was anticipated. There is, in short, an utter failure to show bad faith on the part of the COSC at the time he chose to put off his decision.

Sun also complains that it received no notice of the COSC's abandonment in the latter part of 1970 of his earlier plan to decide the cost and time-extension claims concurrently. The Government insists that plaintiff was sent a copy of

the December 1, 1970 letter communicating the postponement, but in any event the point is quite academic. Three weeks later, the COSC issued his decision on the time-extension aspect alone, thus giving unequivocal notice of his election to proceed separately on that question.

B. The other facet of the delay which Sun challenges occurred after the appeal to the Board on the time-extension claim. This was taken on January 18, 1971, and was referred to the examiner on February 25, 1971. The hearing was scheduled for August 3, 1971, but was postponed twice to December 6, 1971 at Grace's request, to enable it to conclude discovery and to complete its trial preparation. As already noted, this litigation was begun on October 6, 1971, in part (according to Sun) because of the last postponement to December 6th.[14]

Plaintiff is right that the Government may not hide behind the size of a contractor's claim to escape its obligation to render a timely decision, but the amount of a claim does enter into a determination of what is undue time for discovery or excessive delay by the agency. In other cases involving Sun before the Board, five or six years elapsed between delivery of the last ship and final decision by the Board (most notably in the *United States Lines* proceeding).

On what has been presented to us we are unable to conclude that the postponements after the case reached the appeal stage were so unwarranted as to amount to a breach of the Government's duty to decide. Grace did not have any discovery before the end of February 1971; Sun first permitted the owner access to its files on February 22nd. Faced with a voluminous discovery (about 85 file drawers, we are told), Grace made two requests for postponement, the first until early October and then until December 6, 1971. We cannot say that, in a case of this size and directly involving the matter of Sun's costs, these extensions were undue, especially in view of the late date of access by Grace to plaintiff's files. The rules of the Maritime Administration may not compel earlier discovery, but Sun's failure to permit it voluntarily is another indication that the challenged delay was not entirely caused by factors beyond its own control.

■ Moreover, in evaluating the propriety of the delay, we cannot forget that Grace (in addition to the Government) is entitled to exhaustion of the administrative disputes procedure. Under Articles 4 and 36, Appendix, *infra*, the owner (Grace) has a contractual right to appeal controversies to the Board. Where this court has permitted contractors to by-pass agency proceedings and obtain immediate judicial relief, it has acted on the theory that the Government's breach of its own obligation to render a timely decision by the proper official forfeits the Government's correlative right to insist on a disputes clause decision.[15] It is significant that at no point does Sun suggest that Grace has breached its duties in connection with the disputes proceedings and thus lost its right to an administrative determination. Grace's interest must therefore be considered along with plaintiff's and defendant's.

---

14. Sun's brief puts it that Sun had no real assurance that this extension would be the last, that "no meaningful action was forthcoming from the Department of Commerce and MarAd [Maritime Administration] in response to Sun's numerous complaints and requests for action over the last several years including the recent initiatives of [two of Sun's high management personnel]" and "four years had passed without a Maritime Subsidy Board action on its detailed estimate."

15. "The parties originally contemplated an administrative hearing but the defendant, not the contractor, has circumvented that provision of the contract by breaching the agreement to render a proper and timely initial determination. By this rupture of the contract defendant has lost its right to insist upon administrative findings and an administrative decision." New York Shipbuilding, *supra*, 385 F.2d at 438, 180 Ct.Cl. 464. Accord: Zidell Explorations, Inc. v. United States, 427 F.2d 735, 739, 192 Ct.Cl. 331, 338 (1970).

c. The upshot is that, in our judgment, Sun has failed to show that the Government has thus far breached its obligation to render a timely decision. The agency has not acted unlawfully or abused its discretion. *Cf.* Clement Bros. Co. v. United States, 418 F.2d 1356, 190 Ct.Cl. 50 (1969); Zidell Explorations, Inc. v. United States, 427 F.2d 735, 739, 192 Ct.Cl. 331, 338 (1970).[16]

The direct consequence is that plaintiff cannot use the tool of New York Shipbuilding Corp. v. United States, *supra*, 385 F.2d 427, 180 Ct.Cl. 446 (1967) and Universal Ecsco Corp. v. United States, *supra*, 385 F.2d 421, 424–426, 181 Ct.Cl. 10, 16–19 (1967), to substitute a judicial trial of its claim for a miscarried administrative determination. The corollary is that this action is premature and must be dismissed (without prejudice) to await the ending of the administrative process. Zidell Explorations, Inc. v. United States, *supra*, 427 F.2d at 737, 739, 192 Ct.Cl. at 334, 338–339 (1970).[17]

We trust and anticipate that in this old and much-prolonged (though complex) case the Maritime Administration will conclude its proceedings as speedily as feasible. Everyone's interests will be advanced by prompt consideration.

### III.

Grace, the third-party, moves to vacate and quash service on it (at Sun's behest) of the third-party notice. The first ground put forth for this application is the same as the defendant's request for summary judgment—that Sun has failed to exhaust its administrative remedy. Alternatively, Grace insists that there is no warrant in the legislation governing third-party practice in this court, or in our rules, for Sun's attempt to bring Grace into the litigation, even if the court is to entertain the action.

Because we dismiss the petition on the ground that Sun has not yet pursued the administrative road to the end, we need not, and do not, pass at this time upon the alternative aspect of Grace's motion. The service upon Grace necessarily falls with the dismissal of the petition as premature and the termination of the entire case. The motion will be granted on that ground. The other question raised by the Grace application becomes moot and is therefore left undecided.

The defendant's motion for summary judgment and the third-party defendant's motion to vacate and quash service of the third-party notice are granted for the reasons stated. The petition is dismissed without prejudice to the institution of a new action after the completion of the administrative proceeding.

### APPENDIX

Article 4. CHANGES IN PLANS AND SPECIFICATIONS AND AD-

---

16. The petition also alleges that "the Board and the administrative staff view the Article 4(e) and Article 36 dispute procedures as a continuation of claim negotiations rather than the pursuit of a fair and impartial adjudication of the equities among the Contractor, Owner and Government" and "the above described attitude of the Board and its staff combined with their dual role as party litigant and arbitrator make it impossible for Sun to receive a fair hearing under the administrative practice and deprives it of due process." The defendant's motion for summary judgment does not admit such broad and conclusory generalities and plaintiff has not documented them with detailed and adequate affidavits or other material (as it should have if it wished to rely upon the allegations). No triable issue has therefore been raised as to these unspecific assertions and we disregard them as wholly unsupported on the present record which lends them no credence.

17. Under the rule of *Zidell Explorations*, we dismiss the petition entirely, instead of merely suspending proceedings here, because the substantive claim asserted by the petition is plainly "under the contract" and there is no truly separate "breach" claim. Contrast Clement Bros. Co. v. United States, 418 F.2d 1356, 1359, 190 Ct.Cl. 50, 55–56 (1969). Insofar as the petition claims a past breach of the defendant's duty to render a timely decision by the proper official or tribunal, our decision today rejects that claim.

JUSTMENTS OF CONTRACT PRICE FOR CHANGES INCREASING OR DECREASING CONTRACT WORK. (a) The Contractor shall not depart from the requirements of the Plans and Specifications without prior written authorization by the Owner approved by the Board. In making application to the Owner for approval of a change in the Plans and Specifications, the Contractor shall set forth clearly the reasons for and the advantages of such change and shall submit its preliminary estimate of the change in cost, weight, moments and centers and delay in delivery of the Vessel, which estimate shall be accompanied by a full description of the completed work which would be eliminated or would have to be modified, of the acquired material which would not be used if the change is approved and of the effect, if any, of the proposed change upon any guarantee of the Contractor under this contract. The Owner shall consider the Contractor's request with all expedition and dispatch and shall present promptly all relevant data to the Board for approval, together with the Owner's recommended approval or disapproval of the Contractor's request. The Owner shall advise the Contractor in writing of its decision on the Contractor's request, as approved by the Board.

(b) The Owner, with the approval or authorization of the Board, may direct any change in the Plans and Specifications effecting a deduction from or an addition to the contract work set out therein within the general scope thereof; provided, however, if a directed change in the Plans and Specifications affects a guarantee set out in the Specifications specific guarantee set out in the Specifications or in the Special Provisions and such effect is noted by the Contractor in its estimate of the change the guarantee will be modified to the extent determined by the Board. The Contractor shall proceed promptly with all changes authorized or directed by the Owner, and approved or authorized by the Board, as provided in this Article 4; provided, however, if the Board determines that the performance of the increased work incident to a major change will subject the Contractor to damages from the consequent delay of other work of the Contractor then under contract, the Contractor shall not be required to proceed with such additional work unless the Owner agrees to pay to the Contractor such damage costs as determined and approved by the Board.

(c) In connection with the consideration of a proposed change in the Plans and Specifications initiated by the Owner, the Owner may request (if the proposed change makes a major change in the Plans and Specifications such request shall be approved by the Board) the Contractor to submit to the Owner the Contractor's preliminary estimate of the change in cost, weight, moments and centers and delay in delivery of the Vessel which estimate shall be accompanied by a full description of the completed work which would be eliminated or would have to be modified, or acquired material which would not be used if the change is approved and of the effect, if any, of the proposed change on any guarantee of the Contractor under this contract and, if the change is a major change, the damage cost referred to in 4(b) above. Said preliminary estimate shall be submitted to the Owner within the time determined by the Board to be reasonably required for the preparation of such estimate. The Owner and the Board shall consider such preliminary estimate. Within a reasonable time the Contractor shall be directed to proceed by the Owner, as approved by the Board, or shall be advised by the Owner that the proposed change will not be directed. In the event the proposed change is not directed, and the Board determines that the change proposed was a major change in the contract work, the Contractor shall be reimbursed for the engineering and estimating costs involved, as determined by the Board.

(d) Promptly and within a reasonable time, as determined by the Board, after receipt of directions from the Owner, as

approved or authorized by the Board, to make a change in the Plans and Specifications, or authorization by the Owner as approved or authorized by the Board of a change in the Plans and Specifications, requested by the Contractor, the Contractor shall furnish to the Owner, in writing, a statement of its detailed estimate of the net increase or decrease in the cost of the contract work and probable delay in delivery of the Vessel to result from such change.

(e) The Owner shall transmit such statement to the Board which shall consider the Contractor's statement and on the basis thereof and on the basis of such other evidence as the Board may deem relevant shall, as soon as practicable, approve or disapprove the Contractor's estimate. The Owner shall promptly notify the Contractor of the Board's approval or disapproval of the Contractor's estimate. Notwithstanding a dispute in connection with the Contractor's estimate of the cost of a change, the Contractor shall, nevertheless, proceed promptly with the work covered by such directed or approved change. One hundred and ten per cent (110%) of the net increase in estimated cost, if any, resulting from all change cost estimates, as approved or as finally determined, shall be added to the contract price as an adjustment thereof. In the event of a net decrease in contract cost in the total of all such cost estimates the Contract Price shall be reduced by the amount of such net decrease.

(f) In the event the Specifications provide a contract price dollar allowance for specified material or equipment to be purchased by the Contractor upon direction of the Owner, with the approval of the Board, such purchases shall be made in conformity with the provisions of General Order No. 37 of the Federal Maritime Board. The Contract Price will be adjusted in accordance with the provisions of this Article 4 to the extent that the total of such purchases is greater or less than the allowance provided for in the Specifications.

Article 36. DISPUTES.—Any action, omission, direction, decision or determination of the Board, the Owner or the Contractor under this contract may be the subject of a dispute. Any dispute arising under this contract which is not disposed of by agreement of the parties to this contract, shall be decided by the Chief, Office of Ship Construction, of the Maritime Administration or by his duly authorized representative, who as the case may be, shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor and to the Owner, which decision shall be final and conclusive and shall bind all parties to this contract unless within thirty (30) days from the date of receipt of such copy the Contractor or the Owner appeals from said decision by mailing or otherwise furnishing said Chief, Office of Ship Construction, or his duly authorized representative, as the case may be a written appeal addressed to the Board. The decision of the Board on any question of fact, unless determined by a court of competent jurisdiction to have been fraudulent, capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith or is not supported by substantial evidence, shall be final and conclusive and shall bind all the parties to this contract. In connection with any appeal proceeding under this Article 36, the Contractor and the Owner shall be afforded an opportunity to be heard before the Board or before the duly authorized representative or representatives of the Board appointed for the hearing of said appeal and an opportunity to offer evidence in support of or in opposition to the appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract work and in accordance with the decision of said Chief, Office of Ship Construction, or by his duly authorized representative, as the case may be. The fact that the Owner, with or without comment, refers to the Board as hereinbefore provided, the Contractor's estimates as to the cost and

time of making changes, shall not prejudice the rights of any party to have any dispute relating thereto decided under this Article 36.